[S.F. No. 23836. Jan. 25, 1980.]

JOHN M. PRICE, as District Attorney, etc.,
Plaintiff and Respondent, v.
CIVIL SERVICE COMMISSION OF SACRAMENTO COUNTY
et al., Defendants and Appellants.

COUNSEL

John B. Heinrich and L. B. Elam, County Counsel, and Thomas A. Darling, Deputy County Counsel, for Defendants and Appellants.

Stephen Kosta, Peter E. Sheehan, Clifford C. Sweet,. Alice M. Beasley, John H. Erickson, David A. Gerber, Dale L. Gronemeier, Paul L. Hoffman, Margaret C. Crosby, Alan L. Schlosser, Amatai Schwartz, Fred Okrand, Mark R. Rosenbaum, Terry Smerling, Thomas A. Seaton, Mark Aaronson and Nathaniel S. Colley as Amici Curiae on behalf of Defendants and Appellants.

John M. Price and Herb Jackson, District Attorneys, and Roger M. Miller, Deputy District Attorney, for Plaintiff and Respondent.

Patricia Green, Arnold Forster, Jeffrey Sinensky, Mark S. Rudy, Allan Yannow, Edwin L. Miller, Jr., District Attorney (San Diego), Peter C. Lehman and Paul M. Morley, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**TOBRINER, J.**—In this case we must determine whether a governmental entity may voluntarily adopt a race-conscious, affirmative action hiring program of limited duration to alleviate an underrepresentation of minority employees which the entity finds is attributable to its own past discriminatory employment practices.

The trial court in this action enjoined the County of Sacramento from implementing such a remedial hiring program, concluding that any measure that attempts to increase the proportion of minority workers through the employment of hiring ratios or goals violates the constitutional rights of nonminorities, even when the program is adopted as a remedy for past discrimination. The District Attorney of Sacramento County, who initiated the present litigation, maintains that such a race-conscious hiring plan is not only unconstitutional, as the trial court held, but in addition violates various provisions of title VII of the federal Civil Rights Act, the California Fair Employment Practice Act (FEPA) and the Sacramento County Charter.

As we shall explain, in light of the United States Supreme Court's recent decisions in *Steelworkers* v. *Weber* (1979) 443 U.S. 193 [61 L.Ed.2d 480, 99 S.Ct. 2721] and *University of California Regents* v. *Bakke* (1978) 438 U.S. 265 [57 L.Ed.2d 750, 98 S.Ct. 2733], we have concluded that the trial court judgment must be reversed. The *Weber* and *Bakke* decisions teach that neither the pertinent antidiscrimination enactments nor the constitutional equal protection guarantee may properly be interpreted to prohibit a governmental employer from voluntarily implementing a reasonable race-conscious hiring program to remedy the effects of the employer's own past discriminatory employment practices. Such remedial affirmative action measures promote, rather than thwart, the attainment of the ultimate constitutional and legislative objective: a society in which equal employment opportunity is a reality rather than an elusive dream.

1. *The facts and proceedings below.*

In 1974, the Sacramento County Civil Service Commission (Commission), concerned with the relative paucity of minority individuals in the county's employ, conducted a series of hearings into the county's past hiring practices in an attempt to ascertain the reasons for the underrepresentation and to identify potential courses of action to ameliorate the situation.

Testimony and other evidence presented at these hearings revealed that Sacramento County's traditional civil service selection procedures, like similar civil service systems throughout the country, embodied a variety of significant, although apparently inadvertent, discriminatory features. Employment experts explained initially that such civil service systems have traditionally relied heavily either on ostensibly objective written examinations or on avowedly subjective oral examinations (i.e., interviews), both of which have operated to screen out a disproportionate number of minority applicants. Although such examinations were generally employed by governmental employers in the expectation that such procedures would ensure a "merit" selection process, the experts testified that upon analysis the procedures actually utilized could not be so justified. Written civil service examinations very often were severely outdated and bore no relationship to the employment position for which application was being made, and oral examinations were in general neither structured to assure uniformity and fairness in application nor scrutinized to determine that the results of the interview procedure

actually correlated with an applicant's ability to perform the job under consideration.

In addition the experts reported that although civil service positions were theoretically open to all applicants, many public employers in the past undertook few, if any, steps to disseminate information of openings to the public at large. As a consequence, applicants were frequently confined to friends or relatives of present employees who had learned of the job opportunities by word of mouth. Groups who were not already represented in the workforce, including most minority groups, were thus effectively, albeit unintentionally, excluded from the hiring process.

In response to the information developed at this series of hearings, the Commission adopted a general regulation, rule 7.10, entitled "minority preference appointment";[1] the validity of the regulation lies at the heart of the instant controversy. The initial subdivision of rule 7.10 declares: "The purpose of this rule is to provide a procedure for adjustment of disproportionate representation of minority personnel in the County work force which is a result of discriminatory employment practices."

---

[1]Rule 7.10 provides in full:

"MINORITY PREFERENCE APPOINTMENT

"(a) The purpose of this rule is to provide a procedure for adjustment of disproportionate representation of minority personnel in the County work force which is a result of discriminatory employment practices.

"(b) As used in this rule:

"(1) 'Minority personnel' includes, but is not necessarily limited to, Blacks, Indians, Mexican-Americans, Spanish-Americans, Orientals, other non-Whites and women.

"(2) 'Discriminatory employment practice' means the use by the County of selection methods or selection criteria not related to the job.

"(3) 'Alternating ratio' means a ratio indicating a number of minority persons who shall be appointed to a classification for a given number of nonminority persons appointed to the classification.

"(c) The findings required by this rule shall be made separately in relation to each classification after a public hearing at which interested persons are afforded an opportunity to be heard and to present evidence. The Commission may order minority appointment preference as provided in this rule if it finds that: ·

"(1) The number of minority personnel in a classification is disproportionately low in relation to the population mix of the County of Sacramento, including the populations of all cities:

"(2) The disproportionate representation was caused by discriminatory employment practices; and

"(3) It is feasible to adjust the disproportionate representation by requiring that minority persons on an eligible list be appointed on a preferential basis as provided in this rule.

Under the terms of the rule, if the Commission finds "after a public hearing at which interested persons are afforded an opportunity to be heard and to present evidence" that the underrepresentation of minority personnel in a particular classification was caused by "discriminatory employment practices,"[2] and that it is feasible to ameliorate such underrepresentation "by requiring that minority persons on an eligible list be

"(d) If the Commission makes the findings required by this rule, it may order that minority personnel shall be appointed to the classification involved in accordance with an alternating ratio until a specified number of minority persons have been appointed to the classification. The Commission's order shall specify:

"(1) The minority group or groups included in the order:

"(2) The total number of such appointments, which number shall not be greater than necessary to attain a fair approximation of minority representation in the classification consistent with the population mix in the County of Sacramento, including the populations of all cities.

"(3) The alternating ratio to be used, taking into consideration the population mix of the County, the number of minority persons who can be reasonably expected to apply and qualify, and any other relevant circumstances; and

"(4) Any other requirements which the Commission determines are reasonably necessary to assure effective compliance with the order in accordance with the purposes of this rule.

"(e) If the classification is used by more than one department, the order shall also specify the number of minority appointments to be made by each department using the classification. The number for each department may be zero or greater and shall be determined by the Commission for each department on the basis of any relevant considerations including, but not limited to, the number of positions in the classification in the department and the extent to which a representative minority mix already exists in said positions.

"(f) An order may be rescinded or revised from time to time by the Commission as it determines to be necessary or appropriate. Such action may be taken by the Commission on its own motion or at the request of any interested person. In determining whether to rescind or revise an order, the Commission may consider any relevant information including but not limited to the needs of the service, changed circumstances, problems encountered in implementing the order, and information which was not previously considered by the Commission.

"(g) The Director of Personnel Management shall certify for appointment minority persons from the eligible list for a classification for which the Commission has ordered use of an alternating ratio ahead of nonminority persons only when necessary to implement the requirements of the order. If a department required to appoint in accordance with an alternating ratio has not yet made the maximum number of nonminority appointments permitted by the applicable alternating ratio, persons shall be certified for appointment to a vacancy in the classification in the order of their standing on the list. If the department has made the maximum number of nonminority appointments permitted by the ratio, names of minority persons only shall be certified in the order of their standing on the list and the appointment shall be made from among the minority persons whose scores at the time of certification represent the three highest ranks and who are available for appointment."

[2]On its face, the definition of "discriminatory employment practice" in rule 7.10, subdivision (b)(2) (see fn. 1, *ante*) appears to differ from the traditional definition of that term in federal employment discrimination litigation, since as defined in the rule the term could be read to include non-job-related practices which do not adversely affect minorities. Taken as a whole, however, rule 7.10's provisions make it clear that

appointed on a preferential basis as provided in this rule," the Commission may order that minority personnel shall be appointed to the classification involved in accordance with an alternating ratio until a specified number of minority persons have been hired. The rule additionally provides that any such remedial order remains continually subject to modification or rescission, and that "[i]n determining whether to rescind or revise an order, the Commission may consider any relevant information including but not limited to the needs of the service, changed circumstances, problems encountered in implementing the order, and information which was not previously considered by the Commission."

As early as June 1974, the date of the original adoption of rule 7.10, the Commission became aware of, and concerned about, the almost complete absence of minority attorneys in the county district attorney's office. The Commission did not, however, immediately institute proceedings under the new rule but instead postponed any direct action, relying on the district attorney's assurances that he would undertake additional efforts to recruit and hire minority attorneys. In July and December 1974, the district attorney repeated his assurances to the Commission, but when additional minority attorneys had not been hired by the summer of 1975, the Commission commenced a hearing under rule 7.10 to determine whether a remedial order should be issued.

At the conclusion of the hearing, the Commission found that the specific prerequisites to a remedial order under rule 7.10 were established, and that a remedial order should be issued.[3] The Commission noted initially that only 1 of the 65 attorney positions in the district attorney's office was filled by a minority person and thus that the number of minority personnel was "disproportionately low" in relation to the 19.5 percent minority population in Sacramento County generally.

only "discriminatory employment practices" which actually cause a disproportionate underrepresentation of minority employees will warrant the issuance of a race-conscious remedial order under the rule. Moreover, the Commission's ruling in this case plainly indicates that the Commission has interpreted the "discriminatory employment practice" terminology of the rule as synonymous to the categories of employment practices that have been found to violate title VII of the federal Civil Rights Act. (See fn. 17, *post.*)

Accordingly, we shall use the term "discriminatory employment practice" in this opinion as the equivalent of such terminology in the pertinent federal employment discrimination cases.

[3]The remedial order adopted by the Commission applies only to minorities other than women. The Commission's findings explain the basis of this omission: "In accordance with Commission Resolution No. 74-1 the Commission has heretofore implemented

The Commission additionally found that the underrepresentation of minorities resulted from a number of unintentional discriminatory employment practices, including inter alia the use of unvalidated oral examinations and the absence of adequate recruitment efforts. Finally, the Commission found that it would be feasible to adjust the disproportionate representation of minority attorneys in the district attorney's office by implementing the remedial preference authorized by rule 7.10.

In formulating the specifics of the remedial order, the Commission took into account the percentage of available qualified minority attorneys on the county's eligibility list. The Commission's order specified that appointments in the class of Attorney I in the district attorney's office "shall be made on the basis of an alternating ratio of 2:1 so that at least one minority person is appointed for every two nonminority persons" and that "[s]aid ratio shall be applied only until the percentage of minorities in the classes of Attorney I and Attorney II in the District Attorney's office is 8%."

The Commission's findings indicated that in light of the fact that the current Sacramento County Attorney I eligibility list contained 12.7 percent minority representation, and that minority attorneys comprised 17 percent of the entry level attorneys in state legal offices, the 8 percent figure was quite realistic and feasible. Indeed, in terms of the number of lawyers in the Attorney I and Attorney II classifications at the time of the Commission decision, the remedial order would apparently have become inoperative as soon as the district attorney's office hired two or three minority attorneys.[4]

Shortly after the Commission issued its order, the district attorney instituted the instant mandamus proceeding against the Commission and the county board of supervisors, challenging the validity of the Commission's order and, inferentially, the validity of rule 7.10 itself insofar as

Rule 7.10 only for minorities other than women. Necessary studies and hearings regarding representation of women in county employment and affirmative action needs for employment of women are not yet complete. Accordingly, the order of the Commission herein shall be limited to minorities other than women." No party to the present action has raised any objection to this aspect of the order.

[4]There were 34 attorneys in the Attorney I and Attorney II classifications in the district attorney's office at the time the order was issued. The 8 percent goal would be met by the employment of 3 minority attorneys (8 percent of 34 = 2.72). Even if the single minority attorney already employed by the office was promoted to Attorney III, the order would have required only that three of the next nine attorneys hired by the district attorney be qualified minorities.

the rule authorized the implementation of such race-conscious remedial orders. ■ ■■■ After rejecting defendants' preliminary contention that the district attorney lacked authority to maintain the suit,[5] the trial court heard argument on the merits of the case, and thereafter concluded that rule 7.10 was unconstitutional on its face. In view of that conclusion, the trial court found it unnecessary to address the district attorney's additional contention that the findings underlying the Commission's order were not supported by the evidence. The court thereafter entered judgment in favor of the district attorney, permanently restraining the defendants from implementing or enforcing rule 7.10. Defendants have appealed from that judgment.

2. *The Commission was authorized to adopt a general remedial affirmative action program to overcome the effects of its past discriminatory employment practices, and the race-conscious hiring ratios authorized under 7.10 do not violate the Sacramento County Charter, the FEPA, title VII of the federal Civil Rights Act or constitutional equal protection principles.*

Although the trial court rested its decision solely on the asserted unconstitutionality of rule 7.10, on this appeal the district attorney defends the trial court's invalidation of rule 7.10 on a variety of grounds. He contends (1) that the Civil Service Commission lacked authority to implement any affirmative action hiring program, (2) that the "racial ratio" remedial orders authorized by rule 7.10 are prohibited by various provisions of the county charter, the FEPA and title VII of

---

[5]After the trial court overruled their demurrer on this issue, defendants sought a writ of mandate and/or prohibition from the Court of Appeal. The Court of Appeal issued an alternative writ, but ultimately decided the issue in favor of the district attorney, denying the peremptory writ in a written opinion fully discussing the merits of defendants' contention. (*Civil Service Commission* v. *Superior Court* (Feb. 11, 1976) 3 Civ. 15730 [unpub. opn.].) Our court thereafter denied a petition for hearing in the matter.

On the present appeal, defendants seek to relitigate the issue of the district attorney's authority or "standing" to prosecute the instant action. We agree with the district attorney's contention that under the instant circumstances the "law of the case" doctrine defeats defendants' claim on this point. As noted, the Court of Appeal's earlier ruling on the standing issue was a decision on the merits of the claim through a written opinion; such a decision is generally binding under the law of the case doctrine even though the opinion was rendered in an extraordinary writ proceeding. (See, e.g., *People* v. *Medina* (1972) 6 Cal.3d 484, 492 [99 Cal.Rptr. 630, 492, P.2d 686].) Furthermore, as we noted in *Davies* v. *Krasna* (1975) 14 Cal.3d 502, 507, footnote 4 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807]: "The [law of the case] rule applies even though the subsequent appeal comes before this court whereas the prior [proceeding was] before [the Court] of Appeal."

the federal Civil Rights Act and (3) that the county's implementation of such "racial ratio" measures violates the state and federal equal protection clauses. In light of the traditional judicial inclination to avoid a constitutional ruling if a case can be resolved on nonconstitutional grounds (see, e.g., *Ashwander* v. *Tennessee Valley Authority* (1936) 297 U.S. 288, 346-348 [80 L.Ed. 688, 710-712, 56 S.Ct. 466] (Brandeis, J., conc.)), we turn initially to the district attorney's charter and statutory arguments.

 ■ (a) *The Commission was authorized to adopt an affirmative action hiring program to overcome the effects of past discrimination.*

The district attorney argues first that under the provisions of the Sacramento County Charter, the Commission enjoys no authority to implement any form of minority affirmative action program which provides for departure from strict civil service eligibility rankings in the hiring of county employees. Although the district attorney recognizes that the charter specifically designates the Commission as the appropriate governmental body to "establish rules regarding the selection of employees for, and the classification of, civil service positions" (Sacramento County Charter, art. XVI, § 71-B, subd. (a)), he contends that the Commission's authority in this regard is strictly limited by the specific charter provisions which establish the general procedures for the filling of civil service positions through competitive examinations. (See, *id.*, § 71-F, subds. (a)-(c).)[6]

---

[6]Section 71-F, subdivisions (a) through (c) provide: "(a) The county civil service is career service and all appointments to positions in the civil service shall be based on relative fitness as ascertained by competitive examinations. At least ten days' notice shall be given of each examination.

"(b) Eligible lists shall be established upon which shall be entered the names of successful candidates in the order of their standing in examination.

"(c) Eligible lists shall be established upon which shall be entered the names of successful candidates in the order of their ranking in the examination. For the filling of one vacancy, the appointment shall be made from among the eligibles whose scores, at the time of certification, represent the three highest ranks on the list. For purposes of ranking, scores of eligibles on an eligible list shall be rounded to the next highest whole percent and a rank shall consist of one or more eligibles with the same whole percentage score. If a special skill is needed for some, but not all positions, in a class, which special skill has been tested for on a pass or fail basis as a part of the examination on which the list is based and the vacancy is one of the positions in the class requiring the special skill, the appointment may be made from the eligibles possessing the special skill who are available for appointment and whose scores at the time of certification represent the three highest ranks on the list of those who possess the special skill."

Although section 71-F, subdivisions (a) through (c) of the charter do prescribe a general procedure for hiring employees on the basis of rankings on competitive examinations, the district attorney's argument ignores additional charter provisions which specifically proscribe discriminatory employment practices and which authorize the Commission to enforce the antidiscrimination provisions by appropriate regulation or order. (See *id.*, §§ 61; 71-F, subd. (f); 71-B, subds. (d), (g).)[7] Inasmuch as the Commission after a duly authorized investigation (*id.*, § 71-B, subd. (e)) determined that it had grounds to suspect that the county's past competitive examinations had had a racially discriminatory effect and that such examinations were not job-related, we have no doubt that the Commission's enforcement authority empowered it to take action to remedy the situation. Under these circumstances, the promulgation of an affirmative action plan, directed specifically at ameliorating minority underrepresentation which is found to have resulted from the county's own discriminatory employment practices, falls within the authority of the Commission. (Cf. *Associated Gen. Contractors of Mass., Inc.* v. *Altshuler* (1st Cir. 1973) 490 F.2d 9, 20-21, cert. den. (1974) 416 U.S. 957 [40 L.Ed.2d 307, 94 S.Ct. 1971]; *Lindsay* v. *City of Seattle* (1976) 86 Wn.2d 698 [548 P.2d 320, 327] cert. den., 429 U.S. 886 [50 L.Ed.2d 167, 97 S.Ct. 237].)[8]

---

[7]Section 61 provides: "No person in the classified or unclassified service, or seeking admission thereto shall be appointed, reduced, removed, or in any way favored or discriminated against because of his race, color, creed, sex, national origin or political affiliation. The provisions of this section are not intended to prevent the establishment of special limited programs for the employment of economically, socially, physically or mentally deprived persons."

Section 71-F, subdivision (f) provides: "(f) No person in county service, or seeking admission thereto, shall be appointed, reduced, removed, or in any way favored or discriminated against because of his race, color, creed, sex, national origin or political affiliation. This provision is not intended to prevent the establishment of special programs for the employment of economically, socially, physically or mentally deprived persons."

Section 71-B, subdivisions (d) and (g) provide: "(d) The commission shall make final decisions on appeals involving alleged improper action under, or the denial of any rights provided by, this article or the rules adopted thereunder. The commission's authority in this regard pertains only to examinations and other matters under the jurisdiction of the commission pursuant to this article."

"(g) The commission may adopt rules to carry out the commission's powers and duties and governing the commission's proceedings under this article."

[8]An additional charter provision authorizes the Commission to formulate affirmative action plans to aid disadvantaged minorities even in the absence of specific findings of past discrimination. Section 71-F, subdivision (i), a section which follows charter provisions sanctioning the granting of preferences to military veterans and to permanent county employees (§ 71-F, subds. (g) & (h)), authorizes the Commission to "provide for the establishment of programs, including trainee programs, designed to attract and

We find no merit in the district attorney's additional argument that the Commission was "preempted" from adopting its remedial affirmative action by the provisions of the California FEPA. (Lab. Code, § 1410 et seq.) ■ The FEPA does create a statewide remedy for victims of discriminatory employment practices, but nothing in the act evidences any intent to preclude employers—public or private—from voluntarily implementing affirmative action plans to overcome the continuing effects of past discrimination. On the contrary, specific provisions of the FEPA declare that state policy strongly favors the adoption of such voluntary affirmative action plans. (See Lab. Code, § 1431; see also Gov. Code, § 19790 et seq.) Moreover, a recent amendment to Labor Code section 1432, subdivision (c) explicitly provides that nothing in the FEPA is intended to foreclose local governmental entities from going beyond the FEPA and enacting additional measures "banning discrimination in employment by any city, city and county, county, or other political subdivision of the state." (Stats. 1978, ch. 1254, § 19, p. 4077.)

■ Thus, we conclude that the Commission was empowered to adopt a remedial affirmative action program to ameliorate the effects of the county's past discriminatory employment practices.[9]

■ (b) *The remedial race-conscious orders authorized by rule 7.10 do not violate the antidiscrimination provisions of title VII of the federal Civil Rights Act or the comparable antidiscrimination strictures of the Sacramento County Charter and the FEPA.*

---

utilize persons with minimal qualifications, but with potential for development, in order to provide career development opportunities *among members of disadvantaged groups,* handicapped persons and returning veterans. *Such programs may provide for permanent appointment upon the satisfactory completion of the training period without further examination."* (Italics added.)

It does not appear, however, that rule 7.10 was promulgated pursuant to this authority, for the rule limits its remedial orders to instances in which underrepresentation was caused by past discrimination and does not completely bypass the competitive examination procedure but simply authorizes the hiring department to reach otherwise nonappointable minorities on an existing eligibility list. (See rule 7.10, subd. (g) (quoted at fn. 1, *ante*).)

[9]Because the county charter invests the Commission with authority over the procedures for selection of civil service employees, it is clear that, contrary to the dissent's assertions (see *post,* pp. 286-287), the affirmative action plan at issue was *voluntarily* adopted by the County of Sacramento, since the plan was implemented by the Commission without any compulsion by federal or state authorities. The fact that a head of

This issue brings us to the district attorney's principal contention. The district attorney argues that even if the Commission is empowered to adopt some form of affirmative action plan, the "racial hiring ratio" program authorized by rule 7.10 is not a permissible remedial procedure. The district attorney asserts that any remedial measure that reserves a designated percentage of employment opportunities for qualified minority persons impermissibly discriminates against nonminority applicants for county employment on the basis of their race. As such, he maintains that it violates the antidiscrimination provisions of the Sacramento County Charter, of the FEPA, and of title VII of the federal Civil Rights Act. Although the wording of these disparate provisions varies in some respects, each of the sections provides in essence that no person shall be discriminated against in employment opportunities on the basis of his race, color, creed, sex or national origin.[10] The district attorney argues that, literally applied, the terms of these antidiscrimination provisions bar *all* racial hiring ratios—regardless of their remedial nature—since such racial ratio measures operate to ex-

one of the constituent departments of the county-employer, i.e., the district attorney, disagreed with the adoption of such a plan does not, of course, render the plan "involuntary" any more than the disagreement of one of a private employer's foremen or department heads would render a plan adopted by the responsible official of such an employer involuntary.

[10]The relevant provisions of the Sacramento County Charter, sections 61 and 71-F, subdivision (f), are set forth in full at footnote 7, *ante.*

The relevant provision of the FEPA provides as follows: Section 1420: "It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:

"(a) For an employer, because of the race, religious creed, color, national origin, ancestry..., or sex of any person, to refuse to hire or employ him or to refuse to select him for a training program leading to employment, or to bar or to discharge such person from employment or from a training program leading to employment, or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

The relevant provisions of title VII of the federal Civil Rights Act of 1964 provide as follows: Section 703(a) (42 U.S.C. § 2000e-2(a)): "(a) It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

Section 703(d) (42 U.S.C. § 2000e-2(d)): "It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee

clude nonminorities, on the basis of their race, from the percentage of positions reserved for qualified minority applicants.

The United States Supreme Court recently addressed this issue in *Steelworkers* v. *Weber, supra,* 443 U.S. 193 [61 L.Ed.2d 480, 99 S.Ct. 2721]. In *Weber,* an employer, Kaiser Aluminum & Chemical Corporation, seeking "to eliminate conspicuous racial imbalances in [its]...almost exclusively white craft work forces" (*id.,* at p. 198 [61 L.Ed. at p. 485, 99 S.Ct. at p. 2725]), implemented an affirmative action plan which established an in-plant craft training program for its employees. The plan provided that selection of applicants for the training program would be made on the basis of seniority, but additionally provided that at least 50 percent of the new trainees were to be black until the percentage of black skilled craft workers in the plant approximated the percentage of blacks in the local labor force. A nonminority employee who had been rejected for the training program even though he had greater seniority than some of the black employees who had been admitted to the program challenged the validity of the plan under title VII, contending, as the district attorney does in this case, that the "racial ratio" aspect of the plan—reserving 50 percent of the training positions for minorities on a temporary basis—discriminated against him on the basis of his race in violation of the statute.

In *Weber,* Justice Brennan, writing for the majority of the court in a five-to-two decision,[11] rejected the employee's contentions and upheld the validity of the employer's race-conscious affirmative action program. Although the court acknowledged that a literal construction of the antidiscrimination sections of title VII might preclude all such race-conscious remedial programs, the majority concluded that it would be inappropriate to adopt such a construction, explaining "[i]t is a 'familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers.' [Citations.]" (*Id.,* at p. 201 [61 L.Ed.2d at p. 488, 99 S.Ct. at p. 2727].) Upon examination of the legislative history of the Civil Rights Act and a review of the historical context from which the act arose, the court concluded "that an interpretation of the sections

controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training."

[11]Justices White, Stewart, Marshall and Blackmun joined Justice Brennan's opinion in *Weber.* Chief Justice Burger and Justice Rehnquist dissented. Justices Powell and Stevens did not participate in the decision.

that forbade all race-conscious affirmative action would 'bring about an end completely at variance with the purpose of the statute' and must be rejected. [Citations.]" (*Id.*)

The *Weber* court noted, in this regard, that one of the principal goals of the entire Civil Rights Act of 1964 was "the integration of blacks into the mainstream of American society" (*id.*) and that title VII's prohibition of racial discrimination in employment was directed towards "open[ing] employment opportunities for Negroes in occupations which have been traditionally closed to them." (*Id.*, at p. 2728.) Given these circumstances, the court observed that "[i]t would be ironic indeed if a law triggered by a Nation's concern over centuries of racial injustice and intended to improve the lot of those who had 'been excluded from the American dream for so long' [citation] constituted the first legislative prohibition of all voluntary, private, race-conscious efforts to abolish traditional patterns of racial segregation and hierarchy." (*Id.*) ■ ■■■ Accordingly, the *Weber* court held that title VII's prohibition against racial discrimination does not mandate a "colorblind" approach to all employment remedies and does not compel an employer to eschew race-conscious affirmative action programs under all circumstances.[12]

---

[12]A majority of the Supreme Court reached a similar conclusion in construing the provisions of title VI of the federal Civil Rights Act in *Bakke,* determining that the antidiscrimination provision of title VI does not prescribe a totally colorblind regime, but rather permits persons covered by the section to adopt race-conscious programs which, if adopted by a governmental entity, would comport with equal protection principles. (See 438 U.S. 265, 284-287 [57 L.Ed.2d 750, 767-769, 98 S.Ct. 2733] (opn. of Powell, J.); *id.*, at pp. 328-355 [57 L.Ed.2d at pp. 795-812] (opn. of Brennan, White, Marshall and Blackmun, JJ.)

In *Bakke,* Justice Stewart joined Justice Stevens' opinion which apparently would have construed title VI to prohibit any "racial ratio" affirmative action program, at least in the absence of a showing of past discrimination. In the more recent *Weber* case, however, Justice Stewart joined Justice Brennan's opinion which eschewed such an interpretation of an analogous antidiscrimination provision, and thus it appears that at least six justices of the Supreme Court now agree that such antidiscrimination provisions should not normally be construed to bar all race-conscious remedies.

In contending that the Commission's race-conscious hiring practice violates title VII, the district attorney relies on a passage from Justice Stevens' opinion in *Los Angeles Dept. of Water & Power* v. *Manhart* (1978) 435 U.S. 702, 709 [55 L.Ed.2d 657, 666, 98 S.Ct. 1370], which states, inter alia, that "Congress has decided that classifications based on sex, like those based on national origin or race, are unlawful." The *Manhart* decision clearly does not control here, however, for that decision did not pass upon a remedial affirmative action program at all, but instead involved a traditional sex discrimination challenge to an employment practice which operated to disadvantage women.

Similarly, in *McDonald* v. *Santa Fe Trail Transp. Co.* (1976) 427 U.S. 273 [49 L.Ed.2d 493, 96 S.Ct. 2574], relied on by the dissent, Justice Marshall carefully ex-

The *Weber* decision, while refuting the district attorney's broad contention that title VII bans all race-conscious employment procedures, stops short of holding that title VII's antidiscrimination provisions place no restrictions whatsoever on an employer's use of race-conscious measures in affirmative action plans. It suggests that an extreme or inflexible race-conscious program might not be permissible. Although the *Weber* court declined to "define in detail the line of demarcation between permissible and impermissible affirmative action plans" (*id.*, at p. 208 [61 L.Ed.2d at p. 492, 99 S.Ct. at p. 2730]), the court did squarely hold that the affirmative action plan at issue in *Weber* "falls on the permissible side of the line" (*id.*) and its explanation of this conclusion provides at least some rough guidance as to the nature of the factors to be considered in determining the validity of a race-conscious affirmative action plan under title VII.

In sustaining the *Weber* plan, the court stated: "The purposes of the plan mirror those of the statute. Both were designed to break down old patterns of racial segregation and hierarchy. Both were structured to 'open employment opportunities for Negroes in occupations which have been traditionally closed to them.' [Citation.] [Par.] At the same time the plan does not unnecessarily trammel the interests of the white employees. The plan does not require the discharge of white workers and their replacement with new black hires. *Cf. McDonald* v. *Santa Fe*

---

plained that the employer "disclaims that the actions challenged here were any part of an affirmative action program...and we emphasize that we do not consider here the permissibility of such a program, whether judicially required or otherwise prompted." (*Id.* at p. 281, fn. 8 [49 L.Ed.2d at p. 501].) The United States Supreme Court's subsequent decisions in *Bakke* and *Weber,* interpreting the antidiscrimination language of title VI and title VII in an affirmative action context, are unquestionably more directly in point than *Manhart* or *McDonald.*

Furthermore, the suggestion that title VII imposes different standards on public employers than on private employers clearly lacks merit. Contrary to the dissent's assertion, nothing in the *McDonald* decision—which involved a private employer—supports such an argument, and in *Dothard* v. *Rawlinson* (1977) 433 U.S. 321, 332, fn. 14 [53 L.Ed.2d 786, 799, 97 S.Ct. 2720], the Supreme Court explicitly recognized that the legislative history of the 1972 amendments extending title VII to public employers evidenced an intent that "the same Title VII principles be applied to governmental and private employers alike." Moreover, every circuit court that has passed on the issue has concluded that "whether the employer be private or public, the same prerequisites to Title VII liability apply." (See, e.g., *Scott* v. *City of Anniston* (5th Cir. 1979) 597 F.2d 897, 899-900; *Blake* v. *City of Los Angeles* (9th Cir. 1979) 595 F.2d 1367, 1372-1374; *United States* v. *City of Chicago* (7th Cir. 1978) 573 F.2d 416, 420-424; *Firefighters Institute, etc.* v. *City of St. Louis* (8th Cir. 1977) 549 F.2d 506, 510, cert. den. (1977) 434 U.S. 819 [54 L.Ed.2d 76, 98 S.Ct. 60]. See also *Detroit Police Officers' Assn.* v. *Young* (6th Cir. 1979) 608 F.2d 671.) See generally Powers, *Implications of Weber—"A Net Beneath"* (1979) 5 Employee Relations L.J. 325, 333-334.

*Trail Trans. Co.,* [(1976) 427 U.S. 273]. Nor does the plan create an absolute bar to the advancement of white employees; half of those trained in the program will be white. Moreover, the plan is a temporary measure; it is not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance. Preferential selection of craft trainees at the Gramercy plant will end as soon as the percentage of black skilled craft workers in the Gramercy plant approximates the percentage of blacks in the local labor force. [Citation.]" (Fn. omitted.) (*Id.,* at p. 208 [61 L.Ed.2d at p. 492, 99 S.Ct. at p. 2730].) Under these circumstances the court held that the plan did not violate title VII.

This passage from *Weber* suggests that the propriety of a race-conscious plan under title VII will depend first, upon whether the overall purposes of the plan are compatible with the broad objectives of title VII and, second, whether or not the plan operates in an unduly harsh manner on nonminorities, i.e., whether the specific remedial plan "unnecessarily trammel[s] the interests of the white employees." (*Id.*)

When measured against the application of these criteria in *Weber,* the race-conscious program prescribed by rule 7.10 does not violate title VII. First, the purpose underlying rule 7.10 clearly accords with the objectives of title VII. The rule, like the *Weber* plan, seeks to eliminate established patterns of racial segregation and hierarchy and to open employment opportunities from which minorities have been disproportionately excluded. Indeed, rule 7.10 perhaps more clearly resembles the purposes of title VII than the *Weber* plan, since the declared purpose of rule 7.10 "is to provide a procedure for adjustment of disproportionate representation of minority personnel...*which is a result of discriminatory employment practices*" (italics added) whereas the *Weber* plan prescribed remedial measures in the *absence* of proof of any specific employment discrimination.

Second, the race-conscious remedy authorized by rule 7.10 operates no more harshly on the rights of nonminorities than the plan approved in *Weber.* Like the *Weber* program, rule 7.10 does not contemplate the discharge of nonminority workers and their replacement with minority employees. Similarly, the "alternating ratio" procedure prescribed by rule 7.10 creates no absolute bar to the hiring of nonminority personnel; under the order at issue here, for example, up to two-thirds of newly hired attorneys may be nonminorities. Finally, rule 7.10, like the *Weber* plan, makes plain that its remedial orders are temporary in nature, in-

tended simply to eliminate the results of past discrimination and not indefinitely to maintain a prescribed racial balance. Thus, the order under attack here specifies that the minority ratio shall be applied "only until the percentage of minorities in the classes of Attorney I and Attorney II in the District Attorney's office is 8%."

Accordingly, under *Weber*, the race-conscious remedial plan established in rule 7.10 clearly does not violate the antidiscrimination provisions of title VII.

Although the United States Supreme Court's interpretation of the antidiscrimination provisions of title VII does not, of course, necessarily determine the appropriate interpretation of the antidiscrimination provisions of the Sacramento County Charter or the FEPA, we believe that those provisions should similarly not be interpreted to bar all such race-conscious affirmative action plans. First, the relevant provisions of both the county charter and the FEPA arose out of the same historical context as the federal Civil Rights Act and were intended to achieve the same general objectives as the antidiscrimination prohibitions contained in the federal law. Second, additional features in both the county charter provisions and the FEPA demonstrate that their general ban on employment discrimination did not propose to inhibit the promulgation of effective affirmative action programs. Thus, both of the relevant charter provisions—after enumerating the broad prohibition on employment discrimination—go on to state that "[t]he provisions of the section are not intended to prevent the establishment of special limited programs for the employment of economically, socially, physically or mentally deprived persons." (See Sacramento County Charter, art. XIV, § 61; art. XVI, § 71-F, subd. (f) (quoted at fn. 7, *ante*).) Similarly, a recent legislative amendment of the FEPA specifically cautions that the statutory provision "shall not be interpreted in such a manner as to adversely effect otherwise lawful state or federal programs which benefit the physically handicapped, the aged, low-income individuals, *minorities,* or women." (Italics added.) (Stats. 1978, ch. 1254, § 20. p. 4078.)

Moreover, in recent years the California Legislature has enacted a number of additional statutory provisions, relating to the state's own employment practices, that demonstrate a legislative determination that race-conscious affirmative action employment programs which employ specific goals and timetables fully accord with general antidiscrimina-

tion principles. Government Code section 19702, like the earlier-quoted provisions of the Sacramento County Charter and the FEPC, provides broadly that with respect to state civil service employment "[a] person shall not be discriminated against...because of sex, race, religious creed, color, national origin [or] ancestry...." In 1977, the Legislature added a new chapter to the Government Code, sections 19790 through 19797, entitled "State Civil Service Affirmative Action Program." (Stats. 1977, ch. 943, § 2, p. 2876.) The initial provision of the chapter, section 19790, provides in part: "Each agency and department is responsible for establishing an affirmative action program....*Each agency and department shall establish goals and timetables designed to overcome any identified underutilization of minorities and women in their respective organizations.*" (Italics added.)

The new chapter goes on to define the terms "goals," "timetables," and "underutilization." It makes clear that the legislation contemplates that state agencies will develop specific hiring and promotional goals to alleviate situations in which an occupation or departmental level has fewer minorities or women "than would reasonably be expected by their availability."[13] These recently enacted provisions clearly refute the contention of the district attorney and several amici that affirmative action plans which employ concrete goals or ratios conflict with the legislatively expressed public policy of the State of California.

Accordingly, we conclude that the race-conscious remedy provided by rule 7.10 does not violate the prohibition on racial discrimination contained in the Sacramento County Charter, the FEPA or title VII.

(c) *The race-conscious remedial orders authorized by rule 7.10 do not violate either the federal or state equal protection clauses.*

The district attorney argues that even if the recent *Weber* decision established that title VII does not prohibit this kind of race-conscious

---

[13]Section 19791 provides in full: "As used in this chapter: (a) 'Goal' means a projected level of achievement resulting from an analysis by the employer of its deficiencies in utilizing minorities and women and what reasonable remedy is available to correct such underutilization. Goals shall be specific by the smallest reasonable hiring unit, and shall be established separately for minorities and women. (b) 'Timetable' means an estimate of the time required to meet specific goals. (c) 'Underutilization' means having fewer persons of a particular group in an occupation or at a level in a department than would reasonably be expected by their availability."

affirmative action plan, and even if the provisions of the county charter and the FEPA similarly do not bar such a measure, rule 7.10 is nonetheless invalid under the equal protection clauses of the state and federal Constitutions. As the district attorney points out, the United States Supreme Court had no occasion to address the equal protection question in *Weber* because the affirmative action plan under attack in that case was voluntarily adopted by a private employer and the limitations which the Fourteenth Amendment place on state action were thus not at issue. (See 443 U.S. at p. 201 [61 L.Ed.2d at p. 487, 99 S.Ct. at p. 2726].)

Although *Weber* is not directly instructive on the constitutional issue, in *University of California Regents* v. *Bakke, supra,* 438 U.S. 265, decided in the term immediately preceding the *Weber* decision, five justices of the Supreme Court did confront the constitutional questions raised by a governmental entity's adoption of a race-conscious affirmative action plan. ■ ■ ■ ■ ■ As we shall explain, an analysis of the various opinions in *Bakke* demonstrates that the remedial plan at issue in the present case is not unconstitutional.[14]

The *Bakke* case arose out of a challenge to a "special admissions" program established by the UC Davis Medical School which reserved 16 of the 100 places in an entering medical school class for qualified disadvantaged minority students. A nonminority applicant who had been rejected by the medical school attacked the race-conscious special admission program as violative of both the general antidiscrimination

---

[14]In suggesting that the court has disregarded stare decisis by failing to follow this court's initial decision in *Bakke* (see *post,* p. 291), the dissent ignores the fact that this court's decision in *Bakke* was superseded by the United States Supreme Court decision in that case. Inasmuch as our initial *Bakke* decision relied solely on federal constitutional grounds, the subsequent federal high court decision addressing the issue of federal law is the pertinent governing precedent.

Moreover, the dissent's invocation of this court's decision in *Bakke* is particularly inappropriate, since that decision expressly acknowledged the numerous federal cases upholding the validity of governmentally imposed race-conscious remedial measures in the employment discrimination field, and distinguished the affirmative action plan in *Bakke* from the measures approved in the federal cases on the grounds that the record in *Bakke* contained no evidence that the special admissions program was implemented to overcome past discriminatory practices of the UC Davis Medical School. (See *Bakke* v. *Regents of University of California* (1976) 18 Cal.3d 34, 57-60 [132 Cal.Rptr. 680, 553 P.2d 1152].) The affirmative action plan at issue here, tying its race-conscious remedy to the amelioration of specific instances of past discrimination, is directly analogous to the federal employment decisions seemingly approved by this court's *Bakke* decision. (See *id.* at p. 57.)

provisions of title VI of the federal Civil Rights Act and the Fourteenth Amendment of the United States Constitution.

In the United States Supreme Court, four justices—Justice Stevens, Chief Justice Burger, Justice Stewart and Justice Rehnquist—found it unnecessary to reach the constitutional issue because they concluded that, without regard to constitutional demands, title VI should be interpreted to bar the medical school from adopting the race-conscious affirmative action program at issue in that case. The remaining five justices—Justices Powell, Brennan, White, Marshall and Blackmun—however, rejected the notion that, in the context of affirmative action plans, title VI erected barriers to race-conscious programs that were more restrictive than those imposed by the equal protection clause. These five justices concluded instead that "Title VI prohibits only those uses of racial criteria that would violate the Fourteenth Amendment if employed by a state or its agencies . . . ." (438 U.S. at p. 328 [57 L.Ed.2d at p. 795] (opn. of Brennan, White, Marshall and Blackmun; *id.*, at p. 287 [57 L.Ed.2d at p. 769] (opn. of Powell, J.).) In light of this conclusion, of course, these justices found it necessary to address and resolve the equal protection issue.

The justices who spoke to the equal protection issue in *Bakke* expressed their views through two separate opinions. Four justices— Justice Brennan, White, Marshall and Blackmun—joined in an opinion authored by Justice Brennan. Justice Powell wrote a separate opinion signed by no other justice.

Although, as discussed below, Justice Powell's constitutional views differed from his four colleagues' views in a number of significant respects, all five justices agreed that the Fourteenth Amendment does not invariably preclude a governmental entity from utilizing racial classifications in all circumstances. (*Id.*, at pp. 305-306 [57 L.Ed.2d at pp. 780-781] (opn. of Powell, J.); *id.*, at pp. 355-356 [57 L.Ed.2d at pp. 811-812] (opn. of Brennan, White, Marshall and Blackmun, JJ.).) Indeed, a host of prior Supreme Court cases had firmly established not only that the Constitution does not absolutely forbid the use of remedial racial classifications (see, e.g., *McDaniel* v. *Barresi* (1971) 402 U.S. 39 [28 L.Ed.2d 582, 91 S.Ct. 1287]) but also that, in some circumstances, the Constitution actually compels the use of such classifications if such measures are needed to overcome the effects of prior discrimination. (See, e.g., *Board of Education* v. *Swann* (1971) 402 U.S. 43, 46 [28

L.Ed.2d 586, 589, 91 S.Ct. 1284].) Thus, *Bakke* initially makes clear that, like title VII, the Fourteenth Amendment does not absolutely bar a public employer from implementing a race-conscious affirmative action program in all circumstances.

Although the five justices agreed that a governmental entity's use of race-conscious measures could be justified in some situations, Justice Powell departed from the four other justices on the question of the nature of the state interest that would support the adoption of such race-conscious remedial measures. In *Bakke,* the record contained no evidence that the underrepresentation of minority medical students which the special admission program was intended to alleviate had resulted from the medical school's use of discriminatory admission criteria, and the medical school defended its special admission program in part on the grounds that the measure was aimed at ameliorating the effects of general "societal discrimination" against minorities. Justices Brennan, White, Marshall and Blackmun concluded that the medical school's objective of remedying the effects of general societal discrimination was sufficiently important to justify the adoption of a reasonably designed race-conscious affirmative action program. (*Id.,* at pp. 362-369 [57 L.Ed.2d at pp. 816-821].) Justice Powell disagreed on this point, concluding that a desire to remedy the effects of societal discrimination was an insufficiently focused interest to sustain such a program. (*Id.,* at pp. 307-310 [57 L.Ed.2d at pp. 781-784].)[15]

In rejecting the amelioration of societal discrimination as a justification for the use of racial classifications, however, Justice Powell specifically contrasted such a generalized, assertedly "amorphous," objective with the state's interest "in ameliorating, or eliminating where feasible, the disabling effects of *identified* discrimination." (Italics added.) (*Id.,* at p. 307 [57 L.Ed.2d at p. 782].) Justice Powell stated in this regard: "We have never approved a classification that aids persons

---

[15]Justice Powell also concluded, however, that the medical school's interest in obtaining a diverse student body was a sufficiently compelling interest to justify a race-conscious admissions program (438 U.S. at pp. 311-315 [57 L.Ed.2d at pp. 784-787]) and he thus joined with Justices Brennan, White, Marshall and Blackmun in overturning the portion of the trial court judgment which totally barred the medical school from considering race in the admissions process. (*Id.,* at p. 320 [57 L.Ed.2d at p. 790].)

At the same time, because Justice Powell found that the medical school had not demonstrated that its numerical racial ratio program actually furthered the school's interest in obtaining a diverse student body, he joined with Justices Stevens, Stewart, Rehnquist and Chief Justice Burger in invalidating the specific special admissions program at issue in that case. (*Id.,* at pp. 315-320 [57 L.Ed.2d at pp. 786-790].)

perceived as members of relatively victimized groups at the expense of other innocent individuals *in the absence of judicial, legislative or administrative findings of constitutional or statutory violation.* [Citation.] After such findings have been made, the governmental interest in preferring members of the injured groups at the expense of others is substantial, since the legal rights of the victims must be vindicated. In such a case, the extent of the injury and the consequent remedy will have been judicially, legislatively or administratively defined. Also, the remedial action usually remains subject to continuing oversight to assure that it will work the least harm possible to other innocent persons competing for the benefit." (Italics added.) (*Id.*, at pp. 307-308 [57 L.Ed.2d at p. 782].)

As this and other passages of Justice Powell's opinion make clear,[16] although Justice Powell believes that the Fourteenth Amendment does not permit a governmental entity to invoke race-conscious remedies which burden nonminorities simply out of a desire to rectify "societal discrimination," he is of the view that a governmental entity is constitutionally authorized to fashion such race-conscious remedies to ameliorate the effects of judicially, legislatively or administratively identified instances of racial discrimination.[17]

It is apparent, of course, that the *Bakke* decision does not answer all questions as to the compatibility of affirmative action plans and the equal protection clause. As indicated above, only five justices addressed the constitutional issue in *Bakke*; the remaining four justices did not ex-

---

[16]See, e.g., *id.*, at pages 301-302 [57 L.Ed.2d at pages 777-778] and footnote 41 (discussing title VII racial remedy cases and stating "But we have never approved preferential classifications in the absence of proved constitutional or statutory violations"); *id.*, at pages 308-309, footnote 44 [57 L.Ed.2d at page 783] ("Title VII principles support the proposition that findings of identified discrimination must precede the fashioning of remedial measures embodying racial classifications.").

[17]Contrary to the district attorney's contention, Justice Powell's opinion does not suggest that specific racial "ratios," "goals," or "quotas" are impermissible remedies to ameliorate identified violations of statutory or constitutional prohibitions on employment discrimination. Rather, Justice Powell's opinion states in this regard: "The Courts of Appeals have fashioned various types of racial preferences as remedies for constitutional or statutory violations resulting in identified, race-based injuries to individuals held entitled to the preference. [Citations.] Such preferences also have been upheld where a legislative or administrative body charged with the responsibility made determinations of past discrimination by the industries affected, and fashioned remedies deemed appropriate to rectify the discrimination. [Citations.] But we have never approved preferential classifications in the absence of proved constitutional or statutory violations." (*Id.*, at pp. 301-302 [57 L.Ed.2d at pp. 778-779]. See also cases cited at fn. 19, *post*).

press any views on the constitutional question. Prior opinions of the four remaining justices do suggest that a number of those justices concur with Justices Brennan, White, Marshall and Blackmun in the view that specific findings of past discrimination are not a constitutional prerequisite to a public employer's adoption of a race-conscious remedial program;[18] these justices would apparently conclude that, from a constitutional perspective, a public employer, like the private employer in *Weber,* may voluntarily adopt such an affirmative action program to alleviate a serious underrepresentation of minorities in its workforce. We recognize, of course, that it is somewhat hazardous to speculate on the court's ultimate resolution of such issues.

Although uncertainties remain in some areas, the opinions in *Bakke* do attest that the race-conscious remedy authorized by rule 7.10 does not violate the Fourteenth Amendment. The rule before us authorizes race-conscious remedies only under circumstances in which Justice Powell, and, a fortiori, Justices Brennan, White, Marshall and Blackmun (see 438 U.S. at p. 366, fn. 41 [57 L.Ed.2d at p. 779]), have clearly indicated that remedial racial classifications are justified. As we have seen, rule 7.10 provides for the imposition of a racial remedy only after an authorized administrative body, the Civil Service Commission, specifically finds that a disproportionately low percentage of minority employees in a particular department "was caused by discriminatory employment practices"; the race-conscious "alternating ratio" orders sanctioned by the rule are specifically intended to ameliorate the effects of such identified discrimination.[19] Moreover, as suggested in Justice Powell's opinion, rule 7.10 specifically provides that all orders issued under the rule "remain subject to continuing oversight" (see rule 7.10, subd. (f)) so as to enable the Commission to guarantee that the order, in actual operation, will not impose undue burdens on the needs of the service or on the interests of all interested parties.

---

[18]See, for example, *United Jewish Organizations v. Carey* (1977) 430 U.S. 144, 162 [51 L.Ed.2d 229, 243-244, 97 S.Ct. 996] (opn. of White, J., joined, inter alia, by Stevens, J.); *id.,* at p. 165 [51 L.Ed.2d at pp. 245-246] (opn. of White, J., joined, inter alia, by Stevens and Rehnquist, JJ.), *id.* at p. 179-180 [51 L.Ed.2d at pp. 254-255] (opn. of Stewart, J.).

[19]The district attorney, focusing on a portion of rule 7.10 that requires the Commission to determine whether the number of minority personnel in a given job classification "is disproportionately low in relation to the population mix of the County of Sacramento, including the population of all cities" (rule 7.10, subd. (c)(1)), contends that the rule effectively authorizes the use of race-conscious remedies to overcome such "disproportionate representation" without any finding of past discrimination.

Consequently, we conclude that rule 7.10 does not violate federal equal protection guarantees in authorizing the imposition of remedial race-conscious hiring ratios to overcome the effects of past discriminatory employment practices. We note that each of the federal courts of appeals which has faced this question has reached the same conclusion, sanctioning the application of minority hiring ratios similar to that authorized by rule 7.10 to remedy the effects of administratively or judicially determined discrimination.[20] Although many of these federal decisions preceded the *Bakke* opinion, all of the circuit courts which have reviewed the question since *Bakke* have reiterated the propriety of race-conscious hiring ratios in this context,[21] and, during the same week in June 1979 in which it handed down the *Weber* decision, the Supreme

---

The district attorney's reading of the rule, however, ignores the immediately following subdivision, which requires the Commission to find not only the existence of "disproportionate representation" but that "[t]he disproportionate representation *was caused by discriminatory employment practices.*" (Italics added.) (Rule 7.10, subd. (c)(2).) Moreover, the Commission has specifically indicated, in the decision under review here, that "[i]n implementing rule 7.10, it is the intent and purpose of the Commission to adjust for the adverse effect on minorities of past discriminatory employment practices on the basis of substantially the same considerations and decisional law as would be applicable in court in a civil rights action seeking injunctive relief in cases in which there is no evidence of intentional discrimination."

Of course, in a given case, an interested party remains free to challenge the Commission's issuance of a remedial order on the grounds that the order is not justified under rule 7.10 because the evidence before the Commission does not justify a finding that the underrepresentation of minorities in a particular classification was in fact caused by discriminatory employment practices. We address such a contention by the district attorney below.

[20]See, for example, *Associated Gen. Contractors of Mass., Inc.* v. *Altshuler* (1st Cir. 1973) 490 F.2d 9, 16-19 (upholding requirement of 20 percent minority employment by government contractor); *Bridgeport Guard, Inc.* v. *Members of Bridgeport C.S. Com'n* (2d Cir. 1973) 482 F.2d 1333, 1339-1341 (upholding hiring orders requiring 50 percent minority hires until minorities comprise 15 percent of police workforce); *Erie Human Relations Commission* v. *Tullio* (3d Cir. 1974) 493 F.2d 371, 374-375 (upholding 1 to 1 hiring ratio until blacks comprise 5.5 percent of police workforce); *Carter* v. *Gallagher* (8th Cir. 1971) 452 F.2d 315, 327-332 (en banc) cert. den. (1972) 406 U.S. 950 [32 L.Ed.2d 338, 92 S.Ct. 2045] (upholding 1 to 2 hiring ratio until 20 minority firefighters have been hired). See generally Schlei & Grossman, Employment Discrimination Law (1976) pages 1199-1221 and cases cited at page 1200, footnote 20.

[21]See *Firefighters Institute* v. *City of St. Louis, Mo.* (8th Cir. 1978) 588 F.2d 235, 239-242, cert. den. *sub. nom. Banta* v. *Firefighters Institute* (1979) 443 U.S. 904 [61 L.Ed.2d 872, 99 S.Ct. 3096]; *Morrow* v. *Dillard* (5th Cir. 1978) 580 F.2d 1284, 1292-1294; *Fullilove* v. *Kreps* (2d Cir. 1978) 584 F.2d 600, 606-608, cert. granted May 21, 1979, 441 U.S. 960 [60 L.Ed.2d 1064, 99 S.Ct. 2403]. See also *United States* v. *City of Buffalo* (W.D.N.Y. 1978) 457 F.Supp. 612, 640; *Local Union No. 35 etc.* v. *City of Hartford* (D.Conn. 1978) 462 F.Supp. 1271, 1277-1286. (See generally Schlei & Grossman, Employment Discrimination Law (1979 supp.) p. 332; Note, *The Supreme Court, 1977 Term* (1978) 92 Harv.L.Rev. 57, 148.)

Court denied certiorari in one of the post-*Bakke* decisions which approved the application of specific remedial hiring preferences to a governmental employer. (See *Banta* v. *Firefighters Institute* (1979) 443 U.S. 904 [61 L.Ed.2d 872, 99 S.Ct. 3096] denying cert. to *Firefighters Institute* v. *City of St. Louis, Mo.* (8th Cir. 1978) 588 F.2d 235. See also *County of Los Angeles* v. *Davis* (1979) 440 U.S. 625 [59 L.Ed.2d 642, 99 S.Ct. 1379], analyzed in Powers, *Implications of Weber—"A Net Beneath"* (1979) 5 Employee Relations L.J. 325, 334.)

Moreover, in the wake of *Weber,* a number of federal and state decisions have very recently expressly confirmed the validity of voluntary governmental affirmative action employment programs employing concrete race-conscious hiring goals or ratios comparable to the plan at issue in the instant case. (See, e.g., *Detroit Police Officers' Assn.* v. *Young* (6th Cir. 1979) 608 F.2d 671; *Maehren* v. *City of Seattle* (1979) 92 Wn.2d 480 [599 P.2d 1255]. See generally Powers, *Implications of Weber—"A Net Beneath"* (1979) 5 Employee Relations L.J. 325, 333-335.)

Thus, although the United States Supreme Court's recent decision in *Weber* involved a private employer, the *principle* that the eradication of past discrimination against minorities may be corrected by affirmative actions of government entities under the Fourteenth Amendment has been upheld by a majority of the Supreme Court in *Bakke* and by the rulings of all of the federal courts of appeals that have addressed the issue. The principle, moreover, is sustained by the elemental concept that the continuing effects of a past wrong should if possible be remedied by present action.

The district attorney additionally contends that even if the race-conscious remedial measures authorized by rule 7.10 are compatible with the *federal* equal protection guarantee, our court should find such measures barred under *state* equal protection principles. Although the state equal protection guarantee embodied in article I, section 7, subdivision (a) of the California Constitution does provide safeguards separate and distinct from those afforded by the Fourteenth Amendment (see Cal. Const., art. I, § 24; see, e.g., *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 469 [156 Cal.Rptr. 14, 595 P.2d 592]), the district attorney points to no authority which suggests that the California equal protection clause should be interpreted to place greater restrictions on bona fide affirmative action programs than are imposed by the Fourteenth Amendment. To the contrary, our past decisions con-

struing article I, section 7, subdivision (a) reflect this court's recognition of the importance of interpreting the provision in light of the realities of the continuing problems faced by minorities today. (See *Crawford v. Board of Education* (1976) 17 Cal.3d 280, 301-302 [130 Cal.Rptr. 724, 551 P.2d 28].) Viewed from this perspective, we conclude that the state equal protection clause erects no barrier to a municipality's adoption of the kind of affirmative action plan authorized by rule 7.10.

In sum, the race-conscious affirmative action remedy authorized by rule 7.10 violates neither charter, nor statutory, nor constitutional command. Accordingly, we conclude that the trial court erred in striking down rule 7.10 on its face and in restraining defendants from enforcing the rule in the future.

3. *Because the trial court did not pass on the district attorney's additional contention that the evidence presented at the Commission hearing was insufficient to sustain the remedial order under the requirements of rule 7.10, we remand the case to the trial court for resolution of that issue.*

In addition to challenging the general validity of rule 7.10, the district attorney contends that the specific remedial order at issue in this case is invalid and should be set aside. Although the district attorney does not contest the Commission's findings that minority attorneys are significantly underrepresented in his office or that it would be "feasible" for the office to comply with the hiring order, he argues that the evidence before the Commission does not support the Commission's finding that the current disproportionately low percentage of minority attorneys in his office resulted from discriminatory employment practices. Because of the asserted inadequacy of the record to support this finding—which rule 7.10 itself establishes as a prerequisite to a remedial order under the regulation (rule 7.10, subd. (c)(2))—the district attorney maintains that the order cannot stand.

As noted above, the trial court never passed on this issue, finding it unnecessary to reach the question in light of its finding of the facial unconstitutionality of rule 7.10. Under the circumstances, we conclude that the case should be remanded to the trial court to permit it to address the issue in the first instance.

### 4. *Conclusion*

The affirmative action plan at issue in this case is but another small but significant step in bringing about the full participation of minority individuals in our society. Although the essence of a democratic society lies in its emphasis upon the rights of the individual, the implementation of those rights has been a long and arduous process. The noble principles of the Constitution were not applied to blacks for nearly a century of our country's life. Even with the adoption of the Thirteenth, Fourteenth and Fifteenth Amendments, overt racial discrimination against blacks persisted and was condoned under the pernicious "separate but equal" doctrine. Only in the last quarter century, beginning with *Brown* v. *Board of Education* (1954) 347 U.S. 483 [98 L.Ed. 873, 74 S.Ct. 686, 38 A.L.R.2d 1180] and furthered by federal, state and local civil rights legislation, have we undertaken a serious and concerted effort to eliminate the pervasive discrimination long endured by minorities in our society. But the endeavors of the 1950's, 1960's and 1970's have revealed that in light of the history and continuing realities of racial discrimination, the negation of discrimination is frequently not enough. We have found that affirmative steps are at times necessary to overcome the legacy of the past degradation of minorities and to bring minorities into full membership in American society. One such instance of that essential affirmative action is the correction of an employer's past discriminatory employment practice by a race-conscious hiring program such as that of the instant case.

The judgment is reversed and the case is remanded to the trial court for further proceedings consistent with this opinion.

Bird, C. J., Manuel, J., and Newman, J., concurred.

**MOSK, J.**—I dissent.

The wry observation of Justice Rehnquist in his dissent in *Steelworkers* v. *Weber* (1979) 443 U.S. 193, 219 [61 L.Ed.2d 480, 499, 99 S.Ct. 2721], applies to this case: "In a very real sense, the Court's opinion is ahead of its time: it could more appropriately have been handed down five years from now, in 1984, a year coinciding with the title of a book from which the Court's opinion borrows, perhaps subconsciously, at least one idea." That one idea is "doublethink," the tortured abuse of

words and phrases so that their meaning and effect become inverted.[1] Thus here the majority purport to *eliminate* discrimination by means of *creating* discrimination; they construe *equality* of all persons regardless of race to mean *preference* for persons of some races over others; and a hiring program which *compels* compliance by a reluctant district attorney is described as *voluntary*. George Orwell is nodding complacently in his grave, as he wins vindication even before 1984 for his dire apprehensions about the misdirection of society.

Further adopting doublethink, the majority attempt to apply a semantic salve to their approval of the long-discredited racial quota. They seem to believe the leopard's spots can be changed by calling them stripes, that a quota is somehow less a quota if it bears the label of a "racial hiring ratio" or a "race-conscious hiring program." But the spots are still evident. "Quota" is an abbreviated version of the Latin *"quota pars,"* meaning how great a part, or the share or proportion assigned to each member of a total body. One for two, as provided in the Civil Service Commission order involved herein, is purely and simply a racial quota.

Because of the emotion that often beclouds reason when the subject of race is involved, perhaps a disclaimer is appropriate at the outset of this dissent. No member of this court need apologize for his record in opposing racial and sexual discrimination. Over the years we have forthrightly condemned unfair and discriminatory treatment of all persons, regardless of racial or sexual origin, whether that bias was manifest in racial restrictive housing covenants, prohibition of miscegenous marriages, judicial proceedings, employment opportunity or school segregation. We have consistently viewed sympathetically every effort to promote the American dream of equality of rights, duties and opportunity.

That does not mean, however, that we must give carte blanche approval to every proposal, however undemocratic, made in the name of purportedly improving race relations. Justice Powell, for himself and Justices Stewart and Rehnquist, in dissenting from dismissal of certiorari in *Estes v. Metropolitan Branches of Dallas NAACP.* (1980) — U.S. —, — [62 L.Ed.2d 626, 634, 100 S.Ct. 716, 723] wrote, "The pursuit of racial balance at any cost. . .is without constitutional or social

---

[1]In the "doublethink" and "Newspeak" of Orwell's 1984 a key word is "blackwhite." It means a "loyal willingness to say that black is white," but in addition: "the ability to *believe* that black is white, and more, to *know* that black is white, and to forget that one has ever believed the contrary." (Orwell, 1984 (1949) p. 175).

justification. Out of zeal to remedy one evil, courts may encourage or set the stage for other evils."

Respondents, now with the imprimatur of the majority, rely on a syllogism. Equality of opportunity is the goal of our society; affirmative action is a desirable method of enabling those who have been victims of prior discrimination to compete on a basis of equality; therefore in the name of affirmative action we must employ the discredited quota system, which is per se unequal and discriminatory, to achieve the goal. I agree with the major premise of the syllogism, and with the minor premise if all proponents can subscribe to one definition of affirmative action.[2] The syllogistic conclusion—calling for a resurrection of a racial quota—is no more acceptable now than it was when the concerted opposition of intellectuals caused its demise several decades ago.

Those who recall the *numerus clausus* of many prestigious American universities before and after the turn of the century have an uneasy feeling of *deja vu*. Now, however, the virus is spreading beyond the field of education into employment and public service. Those who propose to recast our nation into a representative society, in which ability is secondary to race and sex, are making progress. The progress is attributable to political and social pressures by aggressive exponents of the new racism, and to apathy by those who still adhere to the traditional American ethic of achievement on the basis of merit.[3]

It was not many decades ago that racial and religious quotas—the *numerus clausus*—governed admissions to a great number of universities, particularly in their professional colleges. An enlightened attitude, prodded by aggressive activity by persons devoted to promotion of democracy, ultimately prevailed: educational institutions became convinced that quotas are essentially undemocratic and unjust. Now the trend, particularly in employment, is being reversed under new demands created by a combination of guilt feelings for the sins of ancestors and

---

[2] If affirmative action means preparation and training for the underprivileged so that they may have the skills to compete on a basis of equality, then it is an essential program. But if affirmative action is interpreted as justifying preferences in the actual competition for society's benefits, then it is undemocratic and violative of the *equal protection* clauses of the federal and state Constitutions.

[3] The aggressive proponents of the new racism are actually a small segment of the nation's population. Only 11 percent of the people favor preferential treatment; even among non-whites, only 30 percent favor preferences over selection on ability. (Lipset & Schneider, *The Bakke Case: How Would it be Decided at the Bar of Public Opinion* (1978) 1 Pub. Opn. 38.)

overzealousness by those who insist upon reconstructing a merit society into a representative society.

As Professor Alexander Bickel pointed out in The Morality of Consent (1975) pages 132-133: "A quota is a two-edged device: for every one it includes it cuts someone else out....[¶] If the Constitution prohibits exclusion of blacks and other minorities on racial grounds, it cannot permit the exclusion of whites on similar grounds; for it must be the exclusion on racial grounds which offends the Constitution, and not the particular skin color of the person excluded.

"The lesson of the great decisions of the Supreme Court and the lesson of contemporary history have been the same for at least a generation: discrimination on the basis of race is illegal, immoral, unconstitutional, inherently wrong, and destructive of democratic society. Now this is to be unlearned and we are told that this is not a matter of fundamental principle but only a matter of whose ox is gored. Those for whom racial equality was demanded are to be more equal than others. Having found support in the Constitution for equality, they now claim support for inequality under the same Constitution. Yet a racial quota derogates the human dignity and individuality of all to whom it is applied; it is invidious in principle as well as in practice. Moreover, it can as easily be turned against those it purports to help. The history of the racial quota is a history of subjugation, not beneficence. Its evil lies not in its name but in its effect; a quota is a divider of society, a creator of castes, and it is all the worse for its racial base, especially in a society desperately striving for an equality that will make race irrelevant."

But, argue exponents of the new race-consciousness, their scheme is different: they now propose to use the quota to include, not exclude, racial groups. The answer is obvious: for every person quota-ed in, another is quota-ed out. There is no way in which a numerical quota can be benign. If it favors one, it necessarily rejects another.

In the case at hand, the Civil Service Commission ordered the racial quota to remain in effect until "the percentage of minorities in the classes of Attorney I and Attorney II in the District Attorney's office is 8%."[4] Why the figure should be 8 percent, and not 4 percent, 16 percent, or 32 percent is not revealed. What is evident, however, is that merit is not the goal, but racial representation in a specific percentage

---

[4]This may give an impression of being a mere temporary expedient. But the French, with a cynicism born of experience, have an appropriate saying: *"rien ne dure comme le provisoire"* (nothing lasts like the provisional).

probably related somewhat to that existing in either the community population or the work force.

This requirement of proportionality is inspired by an anachronistic vision of an ideal society, one pervaded by ethnic identification. In that society toward which we are being propelled, the numerical proportionality of races is the principal measure for distribution of society's benefits—not merit, not objective qualification, not competitive achievement.

The foregoing is not a fanciful observation. It can be read into the commission's order and also into Justice Brennan's separate opinion in *University of California Regents* v. *Bakke* (1978) 438 U.S. 265 [57 L.Ed.2d 750, 98 S.Ct. 2733], in which he wrote: "...States also may adopt race-conscious programs designed to overcome substantial, chronic minority underrepresentation where there is reason to believe that the evil addressed is a product of past racial discrimination." (*Id.*, at p. 366 [57 L.Ed.2d at p. 819].) In other words, race-conscious—read: discriminatory—programs are valid so long as "the evil addressed" is the result of racial discrimination; but "the evil" is used not to describe racial discrimination but "minority underrepresentation." It is minority underrepresentation that is considered evil per se. Implicit in this premise to which the Civil Service Commission, and now the majority of this court subscribe, is that it is not racial discrimination per se that is objectionable, but the fact that the social structure fails to conform to their concept of model representative employment practices.

This court should not approve the imposition of a racially representative utopia on the people of any political subdivision. As Justice Douglas insisted in his dissent in *DeFunis* v. *Odegaard* (1974) 416 U.S. 312, 342 [40 L.Ed.2d 164, 183, 94 S.Ct. 1704], such a concept runs counter to the very theory of equal protection: "The State, however, may not proceed by racial classification to force strict population equivalencies for every group in every occupation, overriding individual preferences. The Equal Protection Clause commands the elimination of racial barriers, not their creation in order to satisfy our theory as to how society ought to be organized."

It is now clear that undergirding much of the rhetoric supporting racial quotas, and preferential treatment in general, is a view of justice that demands not that the state treat its citizens without reference to their race, but that it rearrange and index them precisely on the basis of

their race. The objective is not equal treatment but equal representation.

The majority here rely primarily on two recent Supreme Court cases: *Bakke* and *Weber*. Neither lends them any comfort; indeed, both support the conclusion of the trial court.

In our decision in *Bakke* this court manifested specific disapproval of racial quotas. (*Bakke* v. *Regents of University of California* (1976) 18 Cal.3d 34, 62 [132 Cal.Rptr. 680, 553 P.2d 1152].) We declared that no program "in history has been so thoroughly discredited in contemporary times as the use of racial percentages." The doctrine of stare decisis should dictate adherence to that elementary truth a bare three years after it was declared. Previous opinions, particularly when approved in substance by the United States Supreme Court, remain binding, even though, to use the words of Justice Marshall, "the composition of this Court has radically changed." (*Lloyd Corp.* v. *Tanner* (1972) 407 U.S. 551, 584 [33 L.Ed.2d 131, 152, 92 S.Ct. 2219] (Marshall, J., dis.).)

Since they cannot rely on a single prior decision of this court, the majority devote many pages of analysis in a futile effort to avoid the reality of the United States Supreme Court decision in *Bakke*. It can be argued that conclusions about individual justices' opinions lie in the eye of the beholder. But no matter how disingenuous the majority here become, they cannot escape the one undeniable result: *the Davis medical school 84-16 admission quota plan was declared invalid* and Allan Bakke, a white male who alleged racial discrimination because of the quota, was ordered admitted to the school.

If there be any doubt, here are the key holdings of Justice Powell in his lead opinion for himself and for Chief Justice Burger, Justices Stewart, Rehnquist and Stevens: "In summary, *it is evident that the Davis special admissions program involves the use of an explicit racial classification never before countenanced by this Court.* It tells applicants who are not Negro, Asian, or Chicano that they are totally excluded from a specific percentage of the seats in an entering class. . . . *The fatal flaw in [the Davis] preferential program is its disregard of individual rights as guaranteed by the Fourteenth Amendment.*" (438 U.S. at pp. 319-320 [57 L.Ed.2d at pp. 789-790]; italics added.) Therefore, held the Supreme Court (at p. 320 [57 L.Ed.2d at p. 790]), "that portion of the California court's judgment holding [the Davis] special

admissions program invalid under the Fourteenth Amendment must be affirmed."[5]

Among the strange arguments advanced to justify racial quotas is criticism of Justice Powell's opinion in *Bakke* declaring that equal protection "cannot mean one thing when applied to one individual and something else when applied to a person of another color. If both are not accorded the same protection, then it is not equal." (*Id.* at pp. 289-290 [57 L.Ed.2d at pp. 770-771].) One would have thought that principle to be unexceptionable, but do not underestimate the guile of the prolific apologists for modern racism.

The Powell passage is "quotable" but "ill-considered," writes Kenneth W. Simons in *Philosophical Perspectives on Affirmative Action* (1979) 77 Mich.L.Rev. 513, 518-519. "Courts may treat the discriminations differently...blacks, but not whites, fall under it." In other words, equal protection depends upon skin pigmentation! I cite this as an illustration of the excesses and the obscurantism which permeate the drive to restructure ours into a wholly representative society. The majority fall into the same error: paradoxically they perpetuate elitism in order to preserve egalitarianism.

Parenthetically, I note that in his *Bakke* opinion and appendix Justice Powell referred with approval to the admissions policies of Harvard University. The history of Harvard on racial quotas is instructive. In 1922, then President Lowell made a public statement, declaring that racial quotas were under consideration, words that were ominous in the xenophobic post-World War I milieu. A Committee of Thirteen was appointed by the Overseers in 1922 and ultimately submitted a report firmly rejecting the notion of racial quotas. The faculty adopted the report, and it has remained university policy to this day. (See Dean Rosovsky, *From Periphery to Center,* Harv. Magazine (Nov.-Dec. 1979) p. 81 *ff.*)

Consistent with the views of Harvard on quotas, the court in *Bakke* not only did not approve, but specifically invalidated the 84-16 quota system used at Davis. Thus reliance on *Bakke* is clearly counterproductive to the majority. Next they lean heavily but with equal futility on

---

[5]The only portion of our *Bakke* judgment reversed was that which prohibited all consideration of race. The high court would permit an admissions program "involving the competitive consideration of race and ethnic origin." (438 U.S. at p. 320 [57 L.Ed.2d at p. 790].)

*Weber,* a case in which five justices did uphold a racial classification program at the plant of the Kaiser Aluminum & Chemical Corporation, a private employer, which had entered into an employment contract with the United Steelworkers of America, a union representing the private employees. (Justices Powell and Stevens, who had been in the *Bakke* majority, did not participate in *Weber.*)

*Weber,* as stressed repeatedly by its majority, is factually inapposite to a compulsory program involuntarily imposed on and by a public agency. Justice Brennan, writing the lead opinion in which Justices Stewart, White, Marshall and Blackmun joined, declared over and over that the Kaiser plan "does not involve state action" and therefore he emphasized "the narrowness" of the inquiry (*id.,* at p. 200 [61 L.Ed.2d p. 487]). Indeed, on almost every page of his opinion, Justice Brennan spoke redundantly of the parties "voluntarily agreeing" (*id.,* p. 200), Congress "did not intend wholly to prohibit private and voluntary" efforts (*id.,* p. 203 [61 L.Ed.2d p. 489]), Congress did not intend to prohibit acts by "the private sector" (*id.,* p. 204), there is no absolute prohibition against "all private, voluntary" action (*id.,* p. 204), there is no "legislative prohibition of all voluntary, private" efforts (*id.,* p. 204 [61 L.Ed.2d p. 490]), legislators "resisted federal regulation of private business" (*id.,* p. 206 [61 L.Ed.2d p. 491]), "Congress did not intend to limit traditional business freedom to such a degree as to prohibit all voluntary" action (*id.,* p. 207), title VII "does not condemn all private, voluntary" plans (*id.,* p. 208 [61 L.Ed.2d p.492]), title VII permits discretion for plans adopted in "the private sector voluntarily" (*id.,* p. 209).

If there is any other manner of expression by which the Supreme Court could have made it more clear in *Weber* that it approved the plan because it was *voluntary,* not involuntary as here, and in *private industry,* not in the public realm as here, it escapes me as it apparently eluded Justice Brennan. I am confident, in view of the obvious significance of its repeated and emphasized qualifications, that the Supreme Court would have reached a contrary result if racial preferences had been imposed *involuntarily* by a *public agency* and affected *public employment.*

In short, just as there is no California authority there is no persuasive rationale in United States Supreme Court cases supporting compulsory imposition of racial quotas in public employment.

Finally, the majority read title VII of the federal Civil Rights Act as if it were designed to protect minorities only. This view offends the thoughtful opinion of Justice Marshall for a unanimous court in *McDonald* v. *Santa Fe Trail Transp. Co.* (1976) 427 U.S. 273 [49 L.Ed.2d 493, 96 S.Ct. 2574]. He reviewed the congressional history of title VII and concluded it "was intended to 'cover white men and white women and all Americans'" and it created an "'obligation not to discriminate against whites'" (*id.*, p. 280 [49 L.Ed.2d p. 501]). A quota system that excludes whites from one out of three appointments to public employment solely on the basis of their race is manifestly discriminatory.

It is significant that in his *Weber* opinion Justice Brennan did not quarrel with *McDonald*. Indeed, he declared that an argument based on *McDonald* was "not without force" but he found it not to be controlling because the Kaiser plan in *Weber* was "voluntarily adopted by private parties." (*Weber,* at p. 200–202 [61 L.Ed.2d at pp. 487-488].) Once again the implication is clear that if a compulsory program for public employment was involved, *McDonald* would control.

*Griggs* v. *Duke Power Co.* (1971) 401 U.S. 424, 430-431 [28 L.Ed.2d 158, 164, 91 S.Ct. 849], another unanimous decision, clearly holds title VII "does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification."

Under compulsion of *Weber* I would be required to agree with the majority that a voluntary program in private enterprise would not offend title VII.[6] But that is not this case—I repeat: this is a *compulsory* program in *public* employment, an employment paid by the taxpayers of all races and both sexes. The majority nevertheless indulge in a travesty of retroactive myth to bend the history of title VII, and its unequivocal language, to serve the very purpose the act was intended to prohibit. Justice Rehnquist reminds us of the congressional history in

---

[6]Racial quotas in private industry have never been approved by this court. Indeed, we specifically disapproved such hiring practices in *Hughes* v. *Superior Court* (1948) 32 Cal.2d 850, 856 [198 P.2d. 885].

his devastating dissent in *Weber*. Senators Humphrey, Dirksen, Kuchel, Clark and Case, ardent proponents of the Civil Rights Act, assured their colleagues over and over that racial quotas were not contemplated and were unacceptable. To assert otherwise is flagrant history revisionism.

One illustration will suffice. On March 30, 1964, Senator Hubert H. Humphrey led the debate in the Senate on the Civil Rights Act. He analyzed the measure, section by section, in order to persuade the Senate to adopt the proposal, which had both bipartisan support and opposition. When Senator Humphrey came to title VII, he reassured the Congress as follows: "Contrary to the allegations of some opponents of this title, *there is nothing in it that will give any power to the Commission or to any court to require hiring, firing, or promotion of employees in order to meet a racial 'quota' or to achieve a certain racial balance.* [¶] That bugaboo has been brought up a dozen times; but it is nonexistent. In fact, the very opposite is true. Title VII prohibits discrimination. In effect, it says that race, religion and and national origin are not to be used as the basis for hiring and firing. Title VII is designed to encourage hiring on the basis of ability and qualifications, not race or religion. [¶] In Title VII we seek to prevent discriminatory hiring practices. We seek to give people an opportunity to be hired on the basis of merit. . . ." (Italics added.)

Dr. John H. Bunzel, former President of San Jose State University, has concluded that "When the Civil Rights Act of 1964 was passed, Congress reflected the general normative consensus that Americans wanted not only to eliminate discrimination but to make employment opportunity independent of race, colour, religion, sex or national origins. The law intended to 'bring Americans together', not to separate them into categories. It was a sentiment expressed by individuals and groups from every walk of life who participated in the legislative process that gave political sanction *not* to racially preferential treatment, or special privileges for some, or the concept of statistical parity among groups, but to the *elimination of discrimination* against anyone." (Bunzel, *Affirmative Action, Negative Results* (Nov. 1979) Encounter, 43, 51.)

The Supreme Court majority in *Weber* avoided the congressional history by drawing a distinction between *requiring* quotas and *permitting* quotas. The former is prohibited, the latter tolerable.

Accepting that rationale at face value, I would hold that the Civil Service Commission's quota must fall. There can be no question that its formula is compulsory, the district attorney being compelled to adhere to it in all hiring. And obviously, the emphasis placed in *Weber* on private industry cannot be related to public employment which by law must be governed by merit selection. (Sacramento County Charter, art. XVI, § 71-F, subds. (a)-(c).) The majority try in vain to find authorization for racial quotas in county charter sections 61 and 71-F, subdivision (f). But the sections, recited in footnote 7 of the majority opinion, pointedly prohibit discrimination on the basis of race, color, creed, sex, national origin or political affiliation. Some exception is provided for "economically, socially, physically or mentally deprived persons" *of all races.* The civil service order in this case does not involve any of such persons, only the prohibited categories of race and sex.

While I need not discuss the merits of the commission's program, or of rule 7.10 upon which it is based, I cannot resist observing that the scheme is hopelessly flawed and that it is unlikely to serve the purpose for which it is purportedly devised.

Rule 7.10 provides that minority personnel shall be appointed in a number "necessary to attain a fair approximation of minority representation in the classification consistent with the population mix in the County of Sacramento." Minorities are defined as "Blacks, Indians, Mexican-Americans, Spanish-Americans, Orientals, other non-Whites and women." Whoever drafted that definition obviously lacked knowledge of modern demography, for women, ever since World War II, have been a majority in our society, not a minority.

Under the rule, however, the district attorney could appoint one white female for every two white males and he would satisfy the commission. But would he satisfy the Blacks, Indians, Mexican-Americans, Spanish-Americans, Orientals or other non-Whites? I doubt it. The result would be what historians call the Law of Unintended Consequences. (See, e.g., White, In Search of History (Warner Books ed. 1979) p. 304.)

Therein lies one of the numerous vices in compelling such artificial devices as racial quotas in employment. Inevitably one minority group will not be placated by the selection of a member of another group. Even if it were possible for representation to be predicated on popula-

tion, a qualified Samoan or Eskimo would have no chance of employment because the numbers of his race in our state population total is infinitesimal.

There are innumerable other imponderables that emerge in the race-typing business. I suggest only a cursory sample. What percentage of blood makes one a Black or an Indian—75 percent, 50 percent, 25 percent? Does the term Indian apply to native Americans or to natives of India? The Spanish-American category would include a person from Argentina, but not one from Brazil because the latter would be a Portuguese-American. How long is a person deemed to be a Mexican-American before he loses the hyphenation—for one generation after his forebears crossed the border, for two generations, forever? Why are only racial minorities enumerated and not religious minorities, when it is a fact of history that religious discrimination has been a pervasive element in American life from early colonial days?[7]

These defects are not endemic to the Sacramento program alone, they are the inevitable by-product of injection of race as an employment qualification. Thus they, or similar fatal flaws, would appear in any employment scheme that emphasized race, or group characteristics, rather than individual merit.[8]

The district attorney pointed out that he had practical difficulty in recruiting minorities because most of those who were well qualified pre-

---

[7]For a discussion of other insoluble dilemmas in assigning benefits: to which races, how much to each race, which test of race is to be used, see Van Alstyne, *Rites of Passage* (1979) 46 U.Chi.L.Rev. 775, 804-808.

[8]Verification of confusing and false ethnic claims for purposes of teacher assignment plagued the Los Angeles Unified School District in 1976 and 1977. To avoid being included in a compulsory program involving transfer to a distant school, some white teachers were declaring themselves black, some black teachers insisted they were white, others were asserting they were of American Indian origin.

The district thereupon created an Ethnic Designation Committee which promulgated a precise series of proof requirements to establish the ethnicity of teachers. The criteria employed by the district to determine the ethnic makeup of individual teachers include:' verification of racial or ethnic ancestry to the grandparents' generation; birth certificates of the individual and his parents and grandparents; affidavits by a school administrator and a clergyman attesting to the teacher's racial identity. (See Los Angeles Unified School District, Memorandum No. 10, Feb. 2, 1977.)

This tracing of blood lines back to grandparents by a public agency bore remarkable similarity to the Nuremberg Laws of Nazi Germany, a fact that did not escape the attention of some civil rights groups in Los Angeles. After a public protest, on May 18, 1977, the district announced it would no longer implement memorandum No. 10.

It will be recalled that the racial identification policies of Nazi Germany began with the civil service.

ferred to accept appointment from the public defender or other governmental agencies. This problem of selecting qualified persons for professional employment was mirrored in comments about the judiciary by then Attorney General Griffin Bell in an address to the American Law Institute on May 18, 1979 (63 Judicature at p. 118): "'The influx of women and minorities into the bar is still a recent phenomenon, and there is not yet a large pool of women and minority lawyers of sufficient maturity and experience. . . . [¶] Thus, the process is fraught with tension. . . .'" As to this tension, the President of the United States on Law Day, 1979, declared firmly that "Basing present discrimination on past discrimination is obviously not right." ((May 15, 1979) 47 U.S.L. Week 2726.)

In October 1977, the United States Commission on Civil Rights issued a formal statement on affirmative action. In it the commission urged removal of "institutional obstacles to *equal* employment opportunity" (italics added), and while it encouraged achievement goals, it time and again warned against fixed racial quotas. (See U.S. Com. on Civil Rights, Toward an Understanding of Bakke (1979) p. 183.) Its conclusion was, that although we are far from achieving our goal, the "aspiration of the American people is for a 'colorblind' society, one that 'neither knows nor tolerates classes among citizens'." Again in its November 1979 bulletin (Civil Rights Update) the commission reported that the Department of Health and Social Services has issued guidelines on college admission policies "without violating the ban on strict racial or ethnic quotas in the U.S. Supreme Court's *Bakke* decision." Thus it is clear that the federal agency directly concerned with eliminating discrimination understands, as a matter of administrative interpretation, that racial quotas are forbidden.

A few apologists for racial quotas are becoming somewhat restive at the excesses such programs spawn. Professor Bernhardt, while analyzing and approving *Weber* in 65 A.B.A.J. 1321, concludes by warning that "Allowing choice based on race admittedly is a dangerous step, and future developments should be watched to prevent affirmative action programs from becoming a new tyranny." We are, indeed, on the pathway to that new tyranny.

Justice Black once declared, "Great nations, like great men, should keep their word." (*F. P. C.* v. *Tuscarara Indian Nation* (1960) 362 U.S. 99, 142 [4 L.Ed.2d 584, 611, 80 S.Ct. 543].) Our nation gave its word

over and over again: it promised in every document of more than two centuries of history that all persons shall be treated *equally*. However it is rationalized, a preference to any group constitutes inherent inequality. Moreover preferences, for any purpose, are anathema to the very process of democracy. As Justice Murphy wrote, "We of this nation are one people undivided in ability or freedom by differences in race, color or creed." (*Akins* v. *Texas* (1945) 325 U.S. 398, 410 [89 L.Ed. 1692, 1700, 65 S.Ct. 1276].)

At the dawn of a new decade, this court has a rare opportunity to offer a ringing declaration in support of racial equality. Unfortunately the majority elect to approve a preferential and undemocratic program of expediency; the result is likely to convert the 1980's to a decade of disillusionment, an era in which "racism, racial spoils systems, racial competition, and racial odium will be fixtures of government in the United States even into the twenty-first century." (Van Alstyne, *supra,* 46 U.Chi.L.Rev. at p. 778.) We must, in the words of Justice Jackson, "avoid these ends by avoiding these beginnings." (*Board of Education* v. *Barnette* (1943) 319 U.S. 624, 641 [87 L.Ed. 1628, 1639, 63 S.Ct. 1178, 147 A.L.R. 674].)

In addition to all else, the revival of racial quotas tragically denigrates the eloquent words of the first Justice Harlan, dissenting in *Plessy* v. *Ferguson* (1896) 163 U.S. 537 [41 L.Ed. 256, 16 S.Ct. 1138], words that have served as an inspiration to civil rights advocates for more than eight decades: "Our Constitution is colorblind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. . . .It is, therefore, to be regretted that this high tribunal, the final expositor of the fundamental law of the land, has reached the conclusion that it is competent for a State to regulate the enjoyment by citizens of their civil rights solely upon the basis of race."

Racism will never disappear by employing devices of classifying people and of thus measuring their rights. Rather, wrote Professor Van Alstyne, "one gets beyond racism by getting beyond it now: by a complete, resolute, and credible commitment *never* to tolerate in one's own life—or in the life or practices of one's government—the differential treatment of other human beings by race. Indeed, that is the great lesson for government itself to teach: in all we do in life, whatever we do in life, to treat any person less well than another or to favor any

more than another for being black or white or brown or red, is wrong. Let that be our fundamental law and we shall have a Constitution universally worth expounding." (46 U.Chi.L.Rev. at pp. 809-810.)

There is no United States Supreme Court case upholding racial quotas in public employment. There is no California case upholding racial quotas in any employment. The majority opinion is wholly unsupported by precedent and worse, it is regressive in concept. Therefore, I agree with the Court of Appeal that the judgment of the trial court should be affirmed.

Clark, J., and Richardson, J., concurred.

Respondent's petition for a rehearing was denied March 20, 1980, and the dissenting opinion was modified to read as printed above. Mosk, J., Clark, J., and Richardson, J., were of the opinion that the petition should be granted.