**Lee M. HALL, Plaintiff,**

v.

**CITY OF BRAWLEY, a Municipal Corporation; Rodger L. Bennett, Defendants.**

**No. 94–0847 AJB.**

United States District Court,
S.D. California.

May 23, 1995.

---

Lloyd Edward Tooks, San Diego, CA, for plaintiff.

Dennis Morita, El Centro, CA, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BATTAGLIA, United States Magistrate Judge.

### INTRODUCTION

The above entitled cause came regularly for trial on February 23, 1995 at 9:00 a.m. in Department F of the above entitled Court, the Honorable Anthony J. Battaglia, Magistrate Judge presiding, without jury. Consent by the parties to trial by Magistrate Judge pursuant to 28 U.S.C. § 636(c) was filed on January 3, 1995. Plaintiff, LEE M. HALL, appeared by and through his attor-

ney of record, Lloyd Edward Tooks. Defendants, CITY OF BRAWLEY and RODGER L. BENNETT, appeared by and through their attorney of record, Dennis Morita.

This issues tried in this matter are raised in the parties pleadings as well as stated in the Pre-trial Conference Order on file.

### ISSUES PRESENTED

1. Were defendants motivated, in whole or in part, by Plaintiff's race (Caucasian) in deciding to re-interview and test candidates for the Streets and Utilities Maintenance Supervisor position on March 3, 1994?

2. Were defendants motivated, in whole or in part, by Plaintiff's race (Caucasian) when they selected Tony Verdugo for the Streets and Utilities Maintenance Supervisor position effective March 15, 1994?

3. Did defendants terminate Plaintiff's employment with defendant City of Brawley because Plaintiff filed an employment discrimination complaint against the City of Brawley with the Equal Employment Opportunity Commission?

4. Did Defendants terminate Plaintiff's employment with Defendant City of Brawley because Plaintiff did not sign Exhibit "B" to the FAC?

5. Did Defendant City of Brawley refuse to interview Plaintiff for the Utility Lead Person position (a) because Plaintiff filed an employment discrimination complaint against the City of Brawley with the Equal Employment Opportunity Commission, and/or (b) because Plaintiff did not sign Exhibit "B" to the FAC?

6. Did Defendant City of Brawley refuse to select Plaintiff for the Utility Lead Person position (a) because Plaintiff filed an employment discrimination complaint against the City of Brawley with the Equal Employment Opportunity Commission, and/or (b) because Plaintiff did not sign Exhibit "B" to the FAC?

After hearing the testimony, and reviewing the documentary evidence and the agreed facts as set forth in the Pre-trial Conference Order as well as stipulated to by counsel at the hearing, and considering the arguments of counsel, the Court now makes the following findings based on the credible evidence and their reasonable inferences to be drawn therefrom. These findings were made based upon a preponderance of the credible evidence.

### FINDINGS OF FACT

1. Lee Marvin Hall (hereinafter "Plaintiff") is over the age of twenty-one (21) years and his race/national origin is Caucasian.

2. Defendant City of Brawley (hereinafter "City") is a municipal corporation, duly incorporated under the laws of the State of California.

3. Defendant Rodger L. Bennett (hereinafter "Bennett") is now, and at all times relevant to the instant action was, the City Manager of the City.

4. On or about August 3, 1993, Plaintiff was hired by the City as an Engineering Technician. The appointment was "temporary" as defined by the Personnel Rules of the City. A temporary appointment is paid hourly and is not eligible for benefits provided "regular" employees. Further, a temporary appointment such as Plaintiff's is contemplated not to exceed six (6) months in duration.

5. In December of 1993 Plaintiff applied, and was a candidate for, a position within the City's Public Works Department entitled Streets and Utilities Maintenance Supervisor (hereinafter "Streets Supervisor").

6. There were two (2) other candidates for the Streets Supervisor position. Both of the other candidates were "regular", "non-probationary" employees of the City. The race/national origin of one of the other candidates, Martin Stemple, is Caucasian. The race/national origin of the third candidate, Tony Verdugo, is Hispanic.

7. The examination/selection process consisted solely of an oral interview. The oral interview panel was made up of three (3) persons: Rodger Bennett, City Manager, Fred Selk, City Finance Director, and Alvin Smith of the City water treatment facility.

8. Subsequent to the oral interviews, Plaintiff was appointed to the Streets Super-

visor position on a six (6) month probationary status. Probation pursuant to City Personnel Rules is considered part of the examination process. The candidate is required to demonstrate fitness for duty by actual performance.

9. On or about January 13, 1994, Tony Verdugo and Martin Stemple filed employment grievances pursuant to the Memorandum of Understanding between the City and the Brawley Employees' Association.

10. The grievances alleged, among other things, that the selection of Plaintiff to the Streets Supervisor position was "Race/Class discrimination ..." and constituted a "failure to follow affirmative action guidelines...." The grievances further contended that as a temporary employee, Plaintiff was not eligible to compete for the Streets Supervisor position on an in-house basis citing Section 502 of the Personnel Rules of the City.

11. The solution proposed by Verdugo and Stemple included, among others, removal of Plaintiff from the position and appointment of Verdugo.

12. In accordance with the Memorandum of Understanding between the City and the Brawley Employees' Association, Rodger Bennett, as City Manager, investigated the grievances and rendered a written decision.

13. In his decision, Bennett concluded that the selection process for the Streets Supervisor position should be conducted again. Bennett instructed the personnel department to schedule interviews and develop a written examination relating to the skills identified in the position description to be asked uniformly of each participant.

14. In reaching his conclusion, Bennett determined the City had not followed its normal selection process in the December oral interview and as contemplated by Section 501 of the Personnel Rules of the City which provides:

"The selection techniques used in the examination process shall be impartial and relate to those subjects which, in the opinion of the Personnel Officer, fairly measure the relative capacities of the persons examined to execute the duties and responsibilities of the class to which they seek to be appointed. Examinations shall consist of selection techniques which will test fairly the qualifications of candidates such as, but not necessarily limited to, achievement and aptitude tests, other written tests, personal interviews, references, performance tests, physical agility tests, evaluation of daily work performance, work samples, medical tests, psychological tests, successful completion of prescribed training, or any combination of these or other tests. The probationary period shall be considered as a portion of the examination process. Examinations shall be designed to provide equal opportunity to all candidates by being based on analysis of the essential requirements of the class, covering only factors related to such requirements."

15. Notwithstanding Section 502 of the Personnel Rules of the City which states, in part, that "Only regular, non-probationary employees who meet the requirements set forth in the promotional examination announcements may compete in promotional examinations," Bennett denied those portions of the Stemple/Verdugo grievances which sought to eliminate Plaintiff from competing for the Streets Supervisor position. Bennett found that Section 902 of the Personnel Rules authorized him to include "in-house" applicants and not only "regular, non-probationary" employees in the applicant pool.

16. On or about March 1, 1994, Plaintiff was advised that on March 3, the City would test and re-interview candidates for the Streets Supervisor position, the position held by Plaintiff at that time. Among the candidates who were tested and re-interviewed were Plaintiff and Verdugo.

17. The Personnel Officer, Marvin Castillo, with the assistance of Cooperative Personnel Services, a Sacramento, California consulting firm in the field of personnel test development and administration, developed a written essay test, multiple choice test and the oral interview questions to be asked of each candidate.

18. Patrick Murphy, a Management Assistant and Deputy Affirmative Action Officer for the City, proctored the written examination and oral interview. Mr. Murphy also

graded the one-hundred twenty five question multiple choice test with a key provided by Cooperative Personnel Services. Cooperative Personnel Services graded the essay responses of the candidates.

19. Verdugo scored 5 on the essay and 80 on the multiple choice. Plaintiff scored 4 on the essay and 79 on the multiple choice. Stemple scored 2 on the essay and 74 on the multiple choice.

20. The oral examination panel consisted of four persons, A Senior Utility and Street Maintenance worker for the City, the City Fire Chief, the Acting Public Works Director for the City, and the Director of Public Works/Planning for the City of Imperial.

21. The results of the oral interview were as follows: of a total possible of 400 points, Verdugo scored 356, Plaintiff scored 308, and Stemple scored 303.

22. Although the City Fire Chief is related to candidate Verdugo, the oral interview rankings are unchanged if his oral interview scores are eliminated. Eliminating his scores for the candidates yields the following results: Verdugo 271, Plaintiff 238, and Stemple 228. It is also significant that Bayani Mauricio, Director of Public Works/Planning for the City of Imperial testified that he was unaware of the relationship between the Fire Chief and Verdugo. Further, no one made any attempt to influence his scoring of the oral interview.

23. Based on the results of the second examination process, Bennett appointed Verdugo to the position of Streets Supervisor effective on or about March 15, 1994.

24. On or about March 16, 1994, Plaintiff and Bennett met to discuss Plaintiff's future with the City. During the course of the meeting, Bennett offered Plaintiff the Engineering Technician position. If accepted by Plaintiff, the position would be probationary rather than temporary. Further, Bennett offered to compensate Plaintiff for overtime hours worked while Plaintiff occupied the Streets Supervisor position as if the position was not exempt. Plaintiff indicated he would provide documentation of hours worked. The City also contends that Plaintiff further volunteered that he would provide a letter memorializing that he would not hold the City responsible for anything else, i.e., "a release."

25. Defendant Bennett never asked Plaintiff to confirm his acceptance of the Engineering Technician position in writing, or any other matter.

26. The matter of a "release" was not important to the City at the time of the March 16, 1994 meeting but, the testimony of Mr. Bennett was that the release became important as the Plaintiff returned to work and did not fully perform or respond to directions from Mr. Nikjoo.

27. Defendant Bennett drafted Exhibit 7, a memo relating to the "offer of employment" which included a release of claims against the City. On March 28, 1994, Mr. Nikjoo delivered Exhibit 7 to the Plaintiff's work area with a note attached requesting Plaintiff's signature.

28. Defendant Bennett never talked to Plaintiff about Exhibit 7.

29. Plaintiff did not sign Exhibit 7.

30. On or about March 28, 1994 Mr. Hall provided in letter form, the documentation for the overtime compensation. This document became Exhibit 8 at the trial.

31. Plaintiff contends that on or about March 21, 1994, he placed a letter to Bennett in the City document delivery system accepting the position. Bennett denies ever seeing the letter or receiving any indication from Plaintiff that Plaintiff accepted the position. Marvin Castillo, the City Personnel Officer, testified to numerous conversations with Plaintiff subsequent to March 21 in which Plaintiff was noncommittal about acceptance of the position. Additionally, Mr. Castillo caused a memo to be delivered to Plaintiff on or about April 12 inquiring about Plaintiff's intentions concerning the position. Mr. Castillo's action was prompted by requests from the personnel department concerning Plaintiff's status for payment of wages. Mr. Castillo testified, and this court finds, that Mr. Hall tendered his March 21, 1994 letter during his exit interview on April 26, 1994. This finding is also supported by Mr. Castillo's

exit interview notes concerning Mr. Hall (Exhibit 30).

32. Plaintiff contacted the EEOC prior to March 21, 1994 and told Mr. Bennett on or about March 21, 1994 of his action in this regard. The EEOC complaint was filed on April 18, 1994 alleging that the City discriminated against Mr. Hall, on the basis on his race (caucasian), when the City removed him from the Streets Supervisor position and placed Tony Verdugo in that position.

33. On or about April 20, 1994, the EEOC mailed a copy of Plaintiff's EEOC complaint to the City addressed to Bennett; and said copy was received by Bennett on or about April 25, 1995.

34. Plaintiff's position was terminated by the City on April 26, 1994, with Plaintiff receiving the advice by letter from Bennett (Exhibit 12) which indicated that the employment terminated "effective at the end of the work day on April 26, 1994".

35. Plaintiff's involvement with the EEOC process was a motivating factor in his termination.

36. At the time Defendant Bennett wrote the letter of April 26, 1994 (Exhibit 12), terminating Plaintiff's employment with Defendant City of Brawley, Bennett knew that Plaintiff had filed an EEOC complaint against the City of Brawley.

37. Plaintiff reported to work as an engineering technician some time in March 1994. On or about April 12, 1994, Bennett and Behrooz Nikjoo signed the Personnel Action Form (Exhibit 9). The Personnel Action Form (Exhibit 9) notes Plaintiff's change in employment status for the City from the Street Supervisor position to the Engineering Technician position and confirms Plaintiff's status as an employee of the City after March 16, 1994. Exhibit 9 notes Plaintiff's change in employment status for the City from the Streets Supervisor position to the Engineering Technician position.

38. Plaintiff's employment after March 16, 1994 was probationary consistent with City personnel policies.

39. Plaintiff was not performing all of his job duties as an Engineering Technician and was resisting the supervision of Mr. Nikjoo between March 1994 and the termination on April 26, 1994.

40. Defendant Bennett stated that the reason for termination was Plaintiff's conduct (as opposed to job performance) in not accepting the position by signing Exhibit 7 and based upon Plaintiff's conduct in not taking on assignments and the reluctance and refusal to do the work of an Engineering Technician.

41. Defendant Bennett interpreted Plaintiff's not taking on assignments and a reluctance and refusal to do the work of an Engineering Technician as a declination of the position.

42. During his exit interview of April 26, 1994, Plaintiff also presented an employment application for the position of Utility Lead Person in the City's Public Works Department. A job announcement had been issued by the City for that position. Plaintiff was neither granted an interview, nor selected for that position.

43. The Personnel Officer, Marvin Castillo, determined Plaintiff was not eligible for the position since the recruitment was to be "in-house" and Plaintiff was no longer an employee. The expressed concern for an in-house placement was to avoid adding new people within the City which would be precluded by existing budget constraints. Whether or not Plaintiff was still an employee, the City's action in this regard was inconsistent with its prior discretion in interpreting Personnel Rules. Clearly, the Plaintiff could have been considered for the position assuming other appropriate qualifications, without increasing the number of authorized positions in the City.

44. In addition to the ineligibility of the Plaintiff based upon his no longer being an employee, Mr. Castillo acted upon the fact that the Utility Lead Person job announcement indicates, among other things, a requirement of a minimum of three years "in-field" experience in repair, maintenance, and construction of streets, water and sewer systems, and related public words facilities. Mr. Castillo did not believe that the Plaintiff had the necessary qualifications of tenure in

the field of work. The lack of "in-field" experience would have lead to this same result of Plaintiff not being offered the Utility Lead Person position. Mr. Castillo confirmed the lack of service as a reason for not accepting the Utility Lead Person application.

45. The Utility Lead Person job was filled by existing City employees in the related department.

## CONCLUSIONS OF LAW

Plaintiff's claims that the Defendants violated his civil rights fall into two general categories: (1) that the decision to go through a selection process, as well as the final selection of Tony Verdugo for the Streets Supervisor position, was based in whole or in part upon Plaintiff's race; (2) that the decision to terminate Plaintiff from his position as an Engineering Technician, and/or the decision to reject Plaintiff's application for utility lead person, was the result of retaliation.[1] Based upon the findings of fact and the applicable law, the Court makes the following conclusions of law:

1. *Defendants did not Discriminate Against Plaintiff on the Basis of His Race in Their Decision to Undergo a Second Selection Process for the Streets Supervisor Position and their Appointment of Tony Verdugo to that Position Replacing the Plaintiff.*

Title VII (42 U.S.C. § 2000e–2 *et seq.*) declares that it is unlawful for an employer

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ...; or

(2) to limit, segregate, or classify employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race....

42 U.S.C. § 2000e–2(a).

The standards relating to burden of proof, nature of proof, and presumptions in Title VII cases are set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Once a plaintiff has made out a prima facie case of discrimination under Title VII,[2] the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 802, 93 S.Ct. at 1824. The burden that shifts to the defendant is not one of persuasion. Rather, the defendant has the burden of producing evidence sufficient to raise "a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all

---

1. Plaintiff's claims against the City arise under Title VII (42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1983, and California Fair Employment and Housing Act (FEHA) (Cal.Gov.Code § 12900 *et seq.*). Plaintiff's claims against Roger Bennett, individually, are brought under 42 U.S.C. § 1983 and FEHA. Title VII law regarding employment discrimination and retaliation also applies to causes of action under 42 U.S.C. § 1983 and FEHA. *See St. Mary's Honor Center v. Hicks*, —— U.S. ——, —— fn. 1, 113 S.Ct. 2742, 2747 fn. 1, 125 L.Ed.2d 407 (1993) ("the McDonnell Douglas framework is fully applicable to racial-discrimination-in-employment claims under 42 USC § 1983"); *Cook v. Lindsay Olive Growers*, 911 F.2d 233 (9th Cir.1990) (citing *Mixon v. FEHC*, 192 Cal.App.3d 1306, 237 Cal.Rptr. 884, 890 (1987) for the proposition that Title VII law applies to FEHA claims); *Price v. Civil Service*

*Com.*, 26 Cal.3d 257, 161 Cal.Rptr. 475, 604 P.2d 1365 (1980). Therefore, the Court will not separately address the standards for proving a claim under 42 U.S.C. § 1983 and FEHA.

2. It is clear that Title VII protects white males against discrimination to the same extent that it protects women and ethnic or racial minorities. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280, 96 S.Ct. 2574, 2578–79, 49 L.Ed.2d 493 (1976). A prima facie case of demotion by reason of discrimination is made out by showing (1) plaintiff was a member of a protected class; (2) plaintiff was qualified for the position; (3) plaintiff was removed from the position; and (4) plaintiff was replaced by someone of different race or national origin. *St. Mary's*, —— U.S. at ——, 113 S.Ct. at 2746.

times with the plaintiff." *Id.* at 253, 101 S.Ct. at 1093.

█ Once the defendant has carried its burden of production and rebutted the plaintiff's prima facie case, the presumption of discrimination drops away, leaving plaintiff with the ultimate burden of proving that the defendant has intentionally discriminated against him. *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094–95; *St. Mary's Honor Center v. Hicks,* ——— U.S. ———, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The plaintiff's burden is not one of simply persuading the trier of fact that the defendant's explanation is worthy of disbelief; rather, the plaintiff must persuade the trier of fact that the defendant made the adverse employment action as a result of intentional discrimination against the plaintiff. ——— U.S. at———, 113 S.Ct. at 2754. So while proof that defendant's proffered reasons for the employment action are pretextual may help to persuade the trier of fact that the true motive for defendant's action was discrimination, disproof of the defendant's proffered reasons does not spell automatic success for the plaintiff.

█ Where the court finds that discrimination was a motivating factor in the adverse employment action, a violation of Title VII is established. *See* 42 U.S.C. § 2000e–2(m). However, if defendant proves it would have taken the same action even in the absence of the impermissible motivating factor, plaintiff's remedies are limited. *See* 42 U.S.C. § 2000e–5(g)(2)(B).[3] The burden on the defendant to show it would have taken the same action is an affirmative defense. *See Lam v. University of Hawaii,* 40 F.3d. 1551, 1564–65 fn. 25 (9th Cir.1994) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 288, 109 S.Ct. 1775, 1810, 104 L.Ed.2d 268 (1989)).

█ The Plaintiff in this case made out a prima facie case of discrimination in his de-

motion from Streets Supervisor back to Engineering Technician by showing that (1) he was Caucasian; (2) he was qualified for the Streets Supervisor position; (3) he was removed from that position and put back in the position of Engineering Technician; and (4) the Streets Supervisor position was filled by Tony Verdugo, a Hispanic man. In response to Plaintiff's prima facie case, Defendants presented evidence that the second interview process was undertaken because of a concern that ordinary procedures had not been followed in the first process. The "irregularities" that varied from ordinary procedure and formed the basis of grievances filed by Stemple and Verdugo are identified in Exhibit 3. Particularly, Exhibit 3, at page 3 identifies the "heart" of the situation to be the alleged failures to follow affirmative action guidelines, the discouragement of eligible employees from applying to in-house promotional positions, and the hiring of ineligible persons. Tony Verdugo was given the Streets Supervisor position after the second interview process because he was the most qualified person according the scoring of both the written examinations and oral interviews. These reasons set forth by the Defendants are sufficient to rebut the Plaintiff's prima facie case, leaving the ultimate burden of persuasion on Plaintiff.

█ Aside from the evidence which provides for the finding of a prima facie case, Plaintiff presented little other evidence to prove that the second interview process was undertaken on account of Plaintiff's race. First, Plaintiff testified that Mr. Bennett told him they would be going through a second interview process because the interview panel and final selection of Plaintiff gave the appearance of the existence of a "good old white boys" network.[4] Second, Plaintiff pointed to the fact that Tony Verdugo's

---

**3.** Section 2000e–5(g)(2)(B) provides as follows:
  (B) On a claim in which an individual proves a violation under section 2000e–2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court—
    (i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be

directly attributable only to the pursuit of a claim under section 2000e–2(m) of this title; and
    (ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A) [back pay].

**4.** Mr. Bennett denied making such a statement.

grievance contained a claim of discrimination and suggested as a remedy the removal of Plaintiff and appointment of Verdugo to Streets Supervisor. This testimony is insufficient to persuade the Court that the Defendants intentionally discriminated against Plaintiff either in undertaking the second interview process or replacing Plaintiff with Tony Verdugo after that second interview process, or that race was a motivating factor in these regards. Rather, the irregularities of the procedures, as established by the defendant, led to a legitimate business purpose to re-interview and the objective basis for selection for Verdugo was quite clear as was the absence of any evidence of intentional discrimination.

2. *Defendants did Retaliate Against Plaintiff in Their Decision (a) to Terminate Plaintiff from His Position as an Engineering Technician and (b) to Reject Plaintiff's Application for Utility Lead Person.*

Title VII also declares it unlawful for an employer to "discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. 42 U.S.C. § 2000e–3(a). The burden shifting scheme of Title VII under *McDonnell Douglas* and subsequent cases, as described above in section (1), applies in cases claiming retaliation under section 2000e–3. *See Lam v. University of Hawaii*, 40 F.3d 1551, 1559 fn. 11 (9th Cir.1994); *Wallis v. J.R. Simplot Co.*, 26 F.3d 885 (9th Cir.1994) (applying *McDonnell Douglas* burden shifting scheme to retaliation claim).

■ In order to establish a prima facie case for retaliation, the Plaintiff must show (1) that he was engaging in a protected activity, (2) that he suffered an adverse employment decision, and (3) that there was a causal link between the protected activity and the adverse employment decision. *Wrighten v. Metropolitan Hospitals, Inc.*, 726 F.2d 1346, 1354 (9th Cir.1984). Causation sufficient to establish the prima facie case may be inferred from the proximity in time between the protected action and the allegedly retaliatory employment decision. *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987).

a. *Retaliation in Termination of Plaintiff from his Position as Engineering Technician.*

■ It is clear that Plaintiff went to the EEOC concerning the circumstances and events surrounding the second interview process and the hiring of Verdugo. It is also clear that an EEOC complaint was filed and served on the City prior to termination. This is the requisite protected activity necessary to establish the prima facie case of retaliation. It is also clear that the Plaintiff was terminated from employment on April 26, 1994, the day after the EEOC complaint was served on the City by mail. The causal link between the protected activity and the termination, however, is more complex.

Following the March 16, 1994 meeting between Hall and Bennett, Bennett issued the March 18, 1994 memo (Exhibit 5) containing the offer of employment. Exhibit 5 included the overtime reimbursement issue among other things. Plaintiff reports that on March 21, 1994 he advised Bennett of his contact with the EEOC. This event was followed on March 28, 1994 by Bennett's authorship of Exhibit 7, the memo including the release of claims as part of the employment of Hall by the City. As set forth in finding of fact number 24, this was not an initial part of the offer of employment to Plaintiff, but "became important" to Bennett as the events unfolded. Bennett became "apprehensive" that Hall would take the overtime money and "pursue another course". Bennett then authored Exhibit 7 for Plaintiff's signature. Bennett, however, never discussed Exhibit 7 with the Plaintiff. Exhibit 7 was delivered by Behrooz Nikjoo on March 28, 1994 with a note from Nikjoo requesting Plaintiff's signature on the document. On that same date, Mr. Hall tendered Exhibit 8, the calculations associated with the overtime reimbursement. By April 12, 1994, Mr. Castillo, at the request of the personnel department authored Exhibit 10, a Memorandum urging a "re-

sponse" to the proposal regarding continued employment. This was discussed in a conversation between Hall and Castillo on April 18, 1994. On April 18, 1994 the EEOC complaint was filed. Following a mailing on April 20, 1994 the EEOC complaint was received by the City of Brawley on April 25, 1994. The termination occurred one day later and was confirmed in a letter, Exhibit 12, hand delivered to Mr. Hall.

The Defendant contends that Mr. Hall never accepted the offer of March 16, 1994 and confirmed in the March 18, 1995 letter, Exhibit 5. Plaintiff offers that he showed up for work, was put on the payroll in the Engineering Technician position, and submitted his overtime hours consistent with the agreement. While there was some indicia of acceptance by reporting for work, it is clear that the Plaintiff was not performing all of his job duties and was resisting the supervision of Mr. Nikjoo or Simons in his new role in favor of the more undefined and selective duties in association with Mr. Wiberg. It is also clear that Plaintiff was weighing his options, including action concerning the alleged discrimination. His conduct relative to the supervision by Nikjoo and his reluctance and refusal to do the work of an Engineering Technician identified by Defendant Bennett were identified by Defendants as leading to the termination. Standing alone, these facts would have lead the Defendants to take the same action regarding Mr. Hall's termination.

█ It is significant in this decision, and in the Court's findings, however, that the focal point of the activity and this dispute is the change in the mind of the City Manager, Roger Bennett, to requiring the release of claims in this case. Mr. Bennett's concerns were that actions would be brought, and Bennett had a significant basis upon which to form that conclusion given the advice by Hall of his visit to the EEOC. The Court concludes that there is a causal link established by a preponderance of the evidence that the protected activity resulted *in part* in the reasons for termination in this case. The logical inference of the significance to Mr. Bennett of the release was in direct response to the claims Mr. Hall advised he was consid-

ering with regard to alleged discrimination manifested by the contact with the EEOC. The protected activity was only one part of the decision to terminate Mr. Hall, as noted, and Mr. Hall's less than enthusiastic acceptance of continued employment and failure to respond to Mr. Nikjoo's supervision figured in significantly as well. Mr. Hall certainly gave the City other reasons to terminate the employment of a "probationary" or "temporary" employee and his own conduct supports the many statements attributed to him as to his lack of acceptance with the resolution or commitment to the new job. That does not excuse the City's action in mandating this release or terminating Mr. Hall in retaliation as described. However, Mr. Hall's conduct and the legitimate basis for the termination based thereon limits damages in this case as set forth herein.

*b. Retaliation in Rejecting Plaintiff's Application for Utility Lead Person.*

█ Where a plaintiff claims that an employer retaliated against him by failing to hire him for a position, the "adverse employment action" for purposes of the prima facie case is "the closing of the job opening ... and the loss of opportunity to even compete for the position. The plaintiff need not show that she would have obtained the job...." *Ruggles v. California Polytechnic State University,* 797 F.2d 782, 786 (9th Cir.1986). Defendant offers a variety of reasons why Mr. Hall was not an appropriate candidate for the Utility Lead Person and why the application was not accepted. These include the facts that he was not an employee of the City in applying for the "in-house" job, his conduct while in the Engineering Technician position, and his lack of in-the-field experience.

█ One could certainly debate whether or not the tendering of a notice confirming the termination of employment later in the day prevents someone from applying in the interim for a position as a current "employee." This debate borders on the ridiculous and is simply a matter of form over substance. At the time that Mr. Hall was allowed to sit for the second interview process, defendant Bennett acknowledged his discre-

tion to look at "outside candidates" for an in-house position. As City Manager, Mr. Bennett had great discretion with regard to the entire process of hiring and administration. We know that the in-house position was motivated by budget concerns in not acquiring additional staff or exceeding budgetary allotments for personnel. In this instance, however, allowing Hall to apply and even hiring him, would not have increased the City's staff numerically as of April 26, 1994. The Court, therefore, finds that Mr. Hall's not being a current employee was a pretextual reason for rejecting the application and that the City of Brawley was motivated, in part, by the protected activity engaged in by Hall in filing the EEOC complaint.

Despite finding that the City of Brawley rejected Mr. Hall's application, in part, due to improper motives, the Court also finds that Plaintiff's conduct was a basis upon which the City declined to consider Plaintiff as a candidate for this position. More importantly, Plaintiff's lack of "in-the-field" experience led the City to decline the application. Therefore, even in the absence of the impermissible retaliatory motive, the City of Brawley would have made the same decision to reject Mr. Hall's application for Utility Lead Person. Therefore, Plaintiff's damages in this case are limited as set forth below.

*3. Damages.*

The remedies available under Title VII include injunctions, appropriate affirmative action, equitable relief, back pay, compensatory and punitive damages, and attorneys fees. *See* 42 U.S.C. §§ 2000e–5(g), 1981a(1), and 1988(b). However, even if Plaintiff has established an unlawful employment practice, Plaintiff's remedies are limited to declaratory relief, injunctive relief (other than one ordering admission, reinstatement, hiring, promotion, or back pay), and attorney's fees if Defendant persuades the Court it would have taken the same employment action even in the absence of the impermissible motivating factor. 42 U.S.C. § 2000e–5(g)(2)(B).

The Court ordered counsel to brief the issue of whether Defendant's liability is barred by *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) or may be limited by 42 U.S.C. § 2000e–5(g)(2)(B). This is based upon the findings that they were mixed motives concerning defendant's decision to terminate Plaintiff and to not accept the application for Utility Lead Person. Counsel both submit that *Price Waterhouse* would be dispositive in mixed motive cases if applied prior to the Civil Rights Act of 1991 and the amendments to section 793 of Title VII.

*Price Waterhouse* was a mixed motive case, in which it was alleged that both legitimate and discriminatory motives played a role in the disparate treatment. In *Price Waterhouse,* the Supreme Court held that, in a "mixed-motive" case, an employer may avoid liability for discrimination in the employer proves that, even in the absence of the impermissible motive, the same employment decision would have been made. As the Supreme Court has now stated in *Landgraf v. USI Film Products,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994):

> Other sections of the (Civil Rights Act of 1991) were obviously drafted with "recent decisions of the Supreme Court" in mind. Thus, . . .; section 107 responds to *Price Waterhouse v. Hopkins* (citation omitted), by setting forth standards applicable in "mixed-motive" cases.

*Id.* at —— – ——, 114 S.Ct. at 1489–90. This Court, therefore, finds that 42 U.S.C. § 2000e–5(g)(2)(B) applies in this case and would not preclude Defendants' liability but limit damages accordingly.

Plaintiff cites that Defendants' contentions concerning Plaintiff's conduct and the lack of experience were after acquired evidence and, as such, the applicable precedent would be *McKennon v. Nashville Banner Pub Co.,* —— U.S. ——, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), not *Price Waterhouse* or section 2000e–5(g)(2)(B). The Court has found, however, that the knowledge concerning Plaintiff's lack of acceptance of the job and his conduct relating to his reluctance and/or refusal to do the work of an Engineering Technician were known preceding factors to the termination and that *McKennon* is not applicable. In addition, the resume and personnel information available to the Defendant at the

time of Plaintiff's applicable for the Utility Lead Person were part of the decision at the time concerning disposition of the application. Based on this finding, 42 U.S.C. § 2000e–5(g)(2)(B) is the prevailing authority.

■ As set forth above, Mr. Hall provided more than adequate reason for the City to take the action of termination and permissible factors led the City to decline to accept his application for the Utility Lead Person position such that the same actions would have been taken in the absence of the impermissible motivating factor. These facts preponderate to establish that the City would have terminated Plaintiff and would not have accepted his application for Utility Lead Person even in the absence of the impermissible motivating factor. As such, the Court finds that damages here are limited to attorney's fees and costs for the retaliation claims pursuant to 42 U.S.C. § 2000e–5(g)(2)(B).[5]

1. *Liability of the City*

■ The City's liability for retaliation is found under Title 7 as well 42 U.S.C. § 1983 and the California Fair Employment and Housing Act. (See footnote 1.)

2. *Liability of Rodger Bennett Individually*

■ Plaintiff has sued Rodger Bennett individually under both 42 U.S.C. § 1983 and California FEHA. It is clear that Mr. Bennett could not be held liable under Title VII. *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587 (9th Cir.1993). The Court also finds that

Mr. Bennett cannot be held liable under FEHA. The issue of supervisor/individual liability under FEHA has not been resolved by the California Supreme Court. Although there is at least one case finding that a supervisor can be held liable under FEHA for harassment and retaliation, *Page v. Superior Court*, 31 Cal.App.4th 1206, 37 Cal. Rptr.2d 529 (1995) this issue appears to remain in dispute. Because the provisions of Title VII and FEHA are quite similar in their definition of an "employer" who can be held liable for unlawful employment actions. *See* 42 U.S.C. § 2000e(b); Cal.Gov.Code § 12926(c). As such, the reasoning employed by the Ninth Circuit Court of Appeals in *Miller* is appropriately applied to this case, and the Plaintiff's claim of individual liability against Mr. Bennett under FEHA must fail but Mr. Bennett's liability as established herein does exist under 42 U.S.C. § 1983.

*Conclusion*

Based on the above findings of fact and conclusions of law, the Court finds in favor of the Defendants City of Brawley and Rodger L. Bennett on Plaintiff's claim that he was discriminated against on the basis of his race. However, the Court finds in favor of Plaintiff, Lee M. Hall and against Defendants City of Brawley and Rodger L. Bennett on Plaintiff's retaliation claims. The Court also finds that Defendants would have taken the same action with regard to Plaintiff's termination and rejection of his application for Utility Lead Person even in the absence of the impermissible retaliatory motive. Therefore,

---

**5.** The Court finds that *Farrar v. Hobby,* —— U.S. ——, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) does not prohibit Plaintiff in this case from obtaining attorneys' fees despite the fact the Court will not award damages. *Farrar* holds that in order to qualify as a "prevailing party" under the attorney fee provision of the Civil Rights Statutes, 42 U.S.C. § 1988, a plaintiff must obtain "at least some relief on the merits of his claim." *Id.* at ——, 113 S.Ct. at 573. As such, the Court may award attorneys fees under § 1988 only "when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Id.* Where only nominal damages are awarded, the degree of plaintiff's overall success goes to the "reasonableness" of the fee award and leads to a limita-

tion in the total amount of fees that may be awarded. *Id.* at ——, 113 S.Ct. at 574.

The Court finds that this restrictive standard for awarding attorneys does not apply to cases where a plaintiff prevails under § 2000–e5(g)(2)(B). Congress has determined through that section that where a defendant persuades that trier of fact that it would have taken the same adverse employment action even in the absence of an impermissible motivating factor, that defendant may not be liable for damages. However, Congress has specifically allowed in § 2000–e5(g)(2)(B)(i) that although no damages may be awarded, attorneys fees and costs may be awarded. This statutory language prevails over the general case law set forth in *Farrar* for determining who is a prevailing party for purposes of an attorney fee award under 42 U.S.C. § 1988.

the Court finds that Plaintiff is not entitled to damages with regard to the retaliation claims and his remedies in this regard are limited to attorneys fees and costs under 42 U.S.C. § 2000e–5(g)(2)(B)(i).

IT IS ORDERED, ADJUDGED AND DECREED THAT:

Judgment is hereby entered in favor of Plaintiff Lee M. Hall and against Defendants City of Brawley and Rodger L. Bennett. Plaintiff is entitled to reasonable attorney's fees and costs pursuant to statute based upon an application to fix said amount concerning the retaliation claims. Since Plaintiff did not prevail on his claim that the city discriminated against him based upon his race, fees and costs are not available with regard to that claim.